640 A.2d 801

NATALIE FISCH, AS ADMINISTRATRIX AD PROSEQUENDUM AND AS GENERAL ADMINISTRATRIX OF THE ESTATE OF DOLORES LAPOLLO, DECEASED, AND NATALIE FISCH, IN-DIVIDUALLY, PLAINTIFF–APPELLANT, v. RICHARD BELLSHOT, INDIVIDUALLY AND T/A RICHIE'S TAVERN, DE-FENDANT–RESPONDENT, AND ABC CORPORATION (FICTI-TIOUS CORPORATION), INDIVIDUALLY AND T/A RICHIE'S TAVERN AND JOHN DOES # 1–10 (FICTITIOUS NAMES FOR BUSINESS ENTITIES), INDIVIDUALLY, JOINTLY, SEVERAL-LY AND/OR IN THE ALTERNATIVE, DEFENDANTS.

Argued March 1, 1993—Decided May 9, 1994.

376

*John Morelli* argued the cause for appellant.

*Stacy L. Moore, Jr.,* argued the cause for respondent (*Parker, McCay & Criscuolo,* attorneys; *Mary Ann C. O'Brien,* on the brief).

## PER CURIAM

In this appeal we interpret for the first time the "New Jersey Licensed Alcoholic Beverage Server Fair Liability Act," *N.J.S.A.* 2A:22A–1 to –7 (hereinafter Act). In so doing we consider the interaction between the Act and the Comparative Negligence Act, *N.J.S.A.* 2A:15–5.1 to –5.2; the extent to which the principles set forth in *Lee v. Kiku Restaurant,* 127 *N.J.* 170, 603 *A.*2d 503 (1992), and *Buckley v. Estate of Pirolo,* 101 *N.J.* 68, 500 *A.*2d 703 (1985), apply to causes of action under the Act; and whether violations of administrative regulations constitute evidence of negligence under the Act. More specifically, we determine whether the trial court's instruction to the jury on plaintiff's decedent's contributory negligence was erroneous.

I

Plaintiff, Natalie Fisch, individually and as Administratrix Ad Prosequendum and General Administratrix of the Estate of her mother, Delores Lapollo, brought an action against defendant Richard Bellshot, individually and as the owner of Richie's Tavern, pursuant to the Act. The complaint alleged that defendant had served alcohol to Mrs. Lapollo at a time he knew or should have known that she was intoxicated. Moreover, the complaint alleged that that service proximately caused the death of Mrs. Lapollo, who was killed in a one-car accident after leaving defendant's bar following her shift as a bartender somewhere between 10:30 p.m. and 11:00 p.m. on November 22, 1987.

Mrs. Lapollo had reported to work at the tavern that day at approximately 11:00 a.m. Although her scheduled shift was supposed to end at 7:00 p.m., she agreed to work until 10:00 p.m. after her replacement called in sick. Bellshot greeted Mrs. Lapollo on her arrival at the bar at 11:00 a.m. and made her breakfast. He agreed to replace her at 10:00 p.m., but did not actually relieve her until 10:30 p.m. Shortly after defendant replaced her behind the bar, Mrs. Lapollo left the tavern and was subsequently killed in the crash. An autopsy revealed that Mrs. Lapollo's blood alcohol

content at the time of the crash was .20—a level significantly above the legal limit for a driver.

At trial witnesses presented inconsistent testimony regarding decedent's conduct and level of intoxication. Likewise, testimony was in conflict regarding defendant's awareness of Mrs. Lapollo's condition and her conduct throughout the day. Defendant himself testified that he had no indication that Mrs. Lapollo had been drinking or was intoxicated until after she drove away. According to defendant, he served decedent breakfast at 11:00 a.m. and then went to his adjacent apartment to watch the Sunday football games. He did not see her again until 7:00 p.m., when he passed her on his way to dinner. At that time, he did not notice anything unusual about her behavior and had no indication that she was drunk or had been drinking. The next and last time he saw Mrs. Lapollo was when he came to relieve her at approximately 10:30 p.m. He testified that she was angry that he was half-an-hour late in relieving her, that she collected her tips, and then left without saying goodbye. Only after she had gone did he learn from a patron that Mrs. Lapollo had been squirting beer around and was intoxicated.

In addition, defendant testified that only once had he witnessed decedent drink while on duty. That had occurred approximately two weeks before the fatal accident. Defendant did have a policy prohibiting employees from drinking during their shifts. Moreover, all defendant's employees were required to take and to pass a State training and alcohol management course. Mrs. Lapollo had been certified on September 9, 1986. Although it was his policy to fire employees caught drinking on duty, he did not fire Mrs. Lapollo. Defendant stated that he felt sorry for her and believed she would not drink on duty again, so he had merely suspended her.

Other witnesses cast doubt on defendant's testimony. Plaintiff, Mrs. Lapollo's daughter, testified that defendant had phoned her the morning after the fatal crash to inquire about her mother. According to plaintiff,

He asked me if I knew where my mother was and I asked him why, and he said because I kind of had the feeling she was hitting the bottle last night, and at that point I said well, yeah, I just identified the body, she's dead.

Defendant admits to calling plaintiff, but denies that he said that he suspected that decedent had been drinking.

Roger Stewart, a patron of the tavern, testified that he had made two stops at Richie's Tavern on November 22, 1987. At approximately noon, he and Ray Callahan stopped there for lunch. At that time, Stewart did not see defendant and had no indication that Mrs. Lapollo was drunk or had been drinking. He said that when he returned with Callahan at approximately 8:20 p.m. Mrs. Lapollo was apparently intoxicated. He testified that he saw Mrs. Lapollo drink a shot of alcohol with another patron. He further testified that defendant saw this occur as well, but took no action to stop it, and that defendant did not say anything afterward. Defendant's silence did not surprise Stewart because he claimed to have seen decedent drink on duty in the presence of defendant on two or three other occasions without defendant taking corrective action. Ray Callahan confirmed Roger Stewart's testimony concerning Mrs. Lapollo drinking a shot sometime between 8:20 p.m. and 9:00 p.m. He also confirmed that defendant had been present in the bar at the time, but could not confirm that defendant saw Mrs. Lapollo drink the shot.

Gregory Stewart, Roger's brother, also testified on plaintiff's behalf. He testified that he had seen decedent drink a shot of alcohol sometime around 6:00 p.m. Although defendant was not in the bar at that time, Gregory testified that when he returned to the tavern after Mrs. Lapollo had left, defendant told him that he (defendant) had told decedent to leave because she had been drinking.

Heather Mason, a childhood friend of plaintiff, claimed that she had arrived at the tavern at approximately 1:00 p.m. looking for plaintiff. Although plaintiff was not in the bar, she sat down at the bar and talked to decedent for about an hour. During that time, she observed Mrs. Lapollo drink a shot of alcohol. Moreover, she testified that defendant had been present and also had

witnessed Mrs. Lapollo drinking the shot. Ms. Mason further testified that she returned to Richie's Tavern at approximately 10:00 p.m. with a friend. At that time, according to her, decedent was highly intoxicated and continuing to drink.

Two other patrons testified. Joe Wight said that when he arrived at approximately 8:00 p.m., Mrs. Lapollo was intoxicated. The other patron, Nancy Fallon, who arrived at the tavern at approximately 7:30 p.m. and left two hours later, testified that she had seen decedent drink two shots of alcohol. Wight claimed to have seen defendant in the bar between 8:30 p.m. and 9:00 p.m., but Ms. Fallon testified that she did not see defendant in the bar during her stay.

The jury concluded that defendant negligently had served Mrs. Lapollo while she was visibly intoxicated. Moreover, it found that defendant's negligence had proximately caused her death. Yet, the jury also found that decedent had been contributorily negligent and that her negligence also had been a proximate cause of her death. Apportioning the relative degrees of negligence, the jury assessed seventy-five percent to Mrs. Lapollo and twenty-five percent to defendant. As a result, the court dismissed plaintiff's cause of action pursuant to *N.J.S.A.* 2A:15–5.1.

The Appellate Division affirmed and we granted plaintiff's petition for certification, 130 *N.J.* 399, 614 *A.*2d 620 (1992). We now affirm.

## II

Plaintiff first contends that the trial court erred in refusing to instruct the jury on administrative regulations concerning the standards of conduct for alcoholic-beverage licensees. Specifically, plaintiff requested that the trial court's instruction on defendant's negligence include the following two administrative regulations defining the scope of duty of licensed alcoholic-beverage servers for licensing purposes:

*N.J.A.C.* 3:2–23.1(b). No licensee shall sell, serve or deliver or allow, permit or suffer the sale, service or delivery of any alcoholic beverage, directly or indirectly,

to any person actually or apparently intoxicated, or permit or suffer the consumption of any alcoholic beverage by any such person in or upon the licensed premises.

[and]

*N.J.A.C.* 13:2–23.20. No licensee shall work in any capacity in or upon the licensed premises while actually or apparently intoxicated or allow, permit or suffer any actually or apparently intoxicated person to work in any capacity in or upon the licensed premises.

The trial judge determined *in limine* that he would not charge the violation of administrative regulations as elements of negligence. He reasoned that the Act, effective when this cause of action arose, provided the exclusive definition of an alcoholic-beverage server's negligence. We agree.

The Legislature codified civil dram-shop liability in the Act, which was passed on June 25, 1987, and became effective on September 23, 1987. The Act is a comprehensive statutory scheme designed to address the problems that developed in the common-law in the aftermath of *Rappaport v. Nichols*, 31 *N.J.* 188, 156 *A.*2d 1 (1959), and its progeny. The Legislature designed the Act to address the drastic cost increases and widespread unavailability of liability insurance for licensed alcoholic-beverage servers. The Legislature intended to alleviate those problems by limiting dram-shop liability.

Prior to the Act, civil dram-shop liability had evolved in a series of Supreme Court cases beginning with *Rappaport* and ending with *Lee, supra,* 127 *N.J.* 170, 603 *A.*2d 503. For a thorough review of the history of civil dram-shop liability in New Jersey, see *Lee, supra,* 127 *N.J.* at 175–79, 603 *A.*2d at 505–08, and *Buckley, supra,* 101 *N.J.* at 74–79, 500 *A.*2d at 706–09.

Section four of the Act, *N.J.S.A.* 2A:22A–4, unequivocally states that the Act provides the exclusive remedy for dram-shop causes of action arising after the effective date of the Act. Specifically, *N.J.S.A.* 2A:22A–4 provides:

This act shall be the exclusive civil remedy for personal injury or property damage resulting from the negligent service of alcoholic beverages by a licensed alcoholic beverage server. Nothing contained herein shall be deemed to limit the

criminal, quasi-criminal, or regulatory penalties which may be imposed upon a licensed alcoholic beverage server by any other statute, rule or regulation.

[Emphasis added.]

Consistent with its preemptive purpose and exclusive nature, the Act defines the plaintiff's *prima facie* case for all dram-shop causes of action. Specifically, section five, *N.J.S.A.* 2A:22A–5, provides:

a. A person who sustains personal injury or property damage as result of the negligent service of alcoholic beverages by a licensed alcoholic beverage server may recover damages from a licensed alcoholic beverage server *only if:*

(1) The server is deemed negligent pursuant to subsection b. of this section; and

(2) The injury or damage was proximately caused by the negligent service of alcoholic beverages; and

(3) The injury or damage was a foreseeable consequence of the negligent service of alcoholic beverages.

b. *A licensed alcoholic beverage server shall be deemed to have been negligent only when the server served a visibly intoxicated person,* or served a minor, under circumstances where the server knew, or reasonably should have known, that the person served was a minor.

[Emphasis added.]

 We must interpret statutes in accordance with their plain meaning. *Phillips v. Curiale,* 128 *N.J.* 608, 617–18, 608 *A.*2d 895, 900 (1992); *State v. Bigham,* 119 *N.J.* 646, 651, 575 *A.*2d 868, 870 (1990). Absent any specific legislative intent to the contrary, this Court will not do violence to a statute's plain meaning. *Town of Morristown v. Woman's Club,* 124 *N.J.* 605, 610, 592 *A.*2d 216, 219 (1991); *Mortimer v. Board of Review,* 99 *N.J.* 393, 398, 493 *A.*2d 1, 3–4 (1985).

We find no other plausible explanation for the Legislature's use of the word "only." On its face section five exclusively defines negligence for the purposes of civil liability. Negligence is not definable by reference to administrative regulations. Indeed, the Legislature drafted subsection b precisely to render service to a visibly-intoxicated person the *only* defining act of negligence other than serving alcohol to a person whom one knows or reasonably should know under the circumstances is a minor.

■ The foregoing construction effectuates the Legislature's intent. *See Cedar Grove, Inc. v. Stanzione*, 122 *N.J.* 202, 213, 584 *A.*2d 784, 789–90 (1991); *Accountemps Div. v. Birch Tree Group*, 115 *N.J.* 614, 622, 560 *A.*2d 663, 667 (1989). As previously mentioned, the Legislature intended to lend a greater degree of predictability to when and under what circumstances licensed alcoholic-beverage servers would be subject to dram-shop liability. The Legislature made its purpose unmistakably clear.

> In order to make it economically feasible for insurance companies to provide coverage, the incidence of liability should be more predictable. *That predictability may be achieved by defining the limits of civil liability of licensed alcoholic beverage servers in order to encourage the development and implementation of risk reduction techniques.*
>
> [*N.J.S.A.* 2A:22A–2 (emphasis added).]

That purpose would be severely undermined by allowing various administrative regulations to provide alternative standards of care for alcoholic-beverage servers. Allowing administrative regulations to serve as proxies for negligence would introduce unpredictability into dram-shop liability. As a result, alcoholic-beverage servers and licensees would have difficulty obtaining insurance and we would defeat the purpose of the Act.

Plaintiff mistakenly relies on *Geherty v. Moore*, 238 *N.J.Super.* 463, 570 *A.*2d 29 (App.Div.1990), *certif. vacated*, 127 *N.J.* 287, 604 *A.*2d 110 (1991), and other pre-Act cases for the proposition that violation of administrative regulations constitutes negligence. Because the Act is exclusive, administrative regulations are no longer proper benchmarks of a licensee's duty.

We likewise find unpersuasive plaintiff's argument that even if section five provides the exclusive definition of defendant's negligence, the trial court should have instructed on the relevant administrative regulations in order for the jury to assess defendant's and Mrs. Lapollo's relative degrees of fault. Plaintiff contends that although the jury must first determine whether defendant violated the statutory standard of care by having served alcohol to a visibly intoxicated person, the court should allow the

jury to consider whether defendant violated relevant administrative regulations in assessing how negligent he was. Plaintiff's argument is merely an attempt to introduce the administrative regulations through the back door. Not only would such an instruction be confusing, it would also be illogical to hold that violating some standard of care is not evidence of negligence but can be evidence of the degree of negligence. The argument simply makes no sense.

In this case the theory of liability was (and the jury found) that defendant had "served" alcohol to Mrs. Lapollo while she was visibly intoxicated. Because this is a dram-shop cause of action arising solely under the Act, negligence must be defined within the four corners of the Act, not with reference to the administrative regulations governing the licensing of alcoholic-beverage servers. Here, the jury did not consider whether defendant negligently supervised or hired decedent. If a cause of action is premised on a theory of negligent hiring, negligent supervision, or some other theory not involving negligent service, violations of relevant administrative regulations may evidence a tavern owner's negligence.

■ Our courts have consistently held that violations of relevant statutory or regulatory standards of care should be presented to the trier of fact for its evaluation in civil actions. *See Eaton v. Eaton*, 119 *N.J.* 628, 642, 575 *A.*2d 858, 865–66 (1990) (holding that violation of statutory standard of care should be considered by jury); *Braitman v. Overlook Terrace Corp.*, 68 *N.J.* 368, 385, 346 *A.*2d 76, 85 (1975) (stating, "the violation of a statutory duty of care is not conclusive on the issue of negligence in a civil action but it is a circumstance which the trier of fact should consider in assessing liability"); *see also Driscoll v. Department of Treasury*, 265 *N.J.Super.* 503, 514, 627 *A.*2d 1167, 1173 (Law Div.1993) (noting that "any violation of [a] regulation is not conclusive on the issue of negligence in a civil action but merely a circumstance which is to be taken into consideration upon assessing liability"). We do not depart from that well-established principle today, but merely hold that trial courts in dram-shop Act cases may not

instruct the jury that violations of administrative regulations evidence a defendant's negligence.

## III

We turn now to the interaction of comparative negligence and dram-shop liability under the Act. By its express terms, the Act provides that a plaintiff's (in this case decedent's) contributory negligence can limit a defendant's liability under the Act. *N.J.S.A.* 2A:22A–6 provides in relevant part:

> Damages may be awarded in a civil action under P.L.1987, c. 152 (C. 2A:22A–1 et seq.) subject to the limitations set forth in this section.
>
> a. The provisions of sections 1 and 2 of P.L.1973, c. 146 (C. 2A:15–5.1 and C. 2A:15–5.2) shall apply in all civil actions instituted pursuant to the provisions of this act.

Thus, in causes of action under the Act in which "the question of liability is in dispute," the trier of fact must determine "[t]he extent, in the form of a percentage, of each party's negligence . . . [assuming that] the total of all percentages of negligence of all parties to a suit shall be 100%." *N.J.S.A.* 2A:15–5.2.

The original version of the Act would have barred a person who became voluntarily intoxicated and who thereby sustained personal injuries from recovering damages against an alcoholic-beverage server. *Assembly Bill No. 554* § 2 (1985). The Governor's conditional veto of the proposed legislation, however, tempered the Legislature's bright-line bar to recovery by recommending that the Legislature provide a dram-shop cause of action, but limit a licensee's liability "by applying comparative negligence principles where the injured party had the capacity to engage in self-protective measures." *Governor's Veto Message to Assembly Bill Nos. 2264, 2209, 2211, 1876, 1679, 865, and 554* (Jan. 22, 1987). The Legislature adopted the Governor's recommendation almost verbatim. *Compare ibid. with N.J.S.A.* 2A:22A–5, –6. Thus, the Governor's conditional veto and the Legislature's subsequent acquiescence therein make the legislative intent readily discernible. Specifically, public policy is best served by limiting a licensee's

dram-shop liability through the application of comparative negligence rather than by eliminating such liability entirely.

In *Buckley, supra*, 101 *N.J.* 68, 500 *A*.2d 703, we addressed the common-law dram-shop rules in the context of the Legislature's adoption of the Comparative Negligence Act. There, we reassessed our holding in *Soronen v. Olde Milford Inn*, 46 *N.J.* 582, 218 *A*.2d 630 (1966), in light of the Legislature's decision to supplant the harsh doctrine of contributory negligence with comparative negligence. In *Soronen*, we rejected the tavern owner's defense of contributory negligence in an action brought by the survivors of a tavern patron who had died as a result of falling off a bar stool and striking his head on a metal column. *Id.* at 590, 218 *A*.2d at 635. In *Buckley*, we reasoned that the impetus behind the *Soronen* rule—precluding a negligent tavern owner from being completely insulated from liability due to even slight negligence on the part of a plaintiff—had lost its force in light of the adoption of comparative negligence. 101 *N.J.* at 77–78, 500 *A*.2d at 708–09.

Thus, *Buckley* permitted a limited comparative-negligence defense in dram-shop actions. If a tavern owner could demonstrate that a plaintiff had the ability to appreciate the risk of driving while intoxicated or of accompanying an intoxicated driver, the tavern owner could reduce his or her liability in accordance with the Comparative Negligence Act. *Ibid.* If, on the other hand, a patron's intoxicated condition rendered the patron unable to appreciate such a risk and the tavern owner served the patron alcohol when he or she was visibly intoxicated, the tavern could not assert the defense of comparative negligence. *Ibid.*

We reassessed the principles governing civil dram-shop liability in *Lee, supra*, 127 *N.J.* 170, 603 *A*.2d 503. Although the cause of action in *Lee* arose under the common law, nothing in the Act suggests a legislative intent contrary to our decision in *Lee*. In fact, we were fully cognizant of the Act in our decision in *Lee* and we concluded then, as we do now, that the principles set forth

therein are completely "consistent with the apparent intent of the Legislature in enacting the Act." *Id.* at 183, 603 *A*.2d at 509.

In *Lee,* a passenger in a car driven by an intoxicated driver sought to recover from the restaurant who had served the driver when he was visibly intoxicated. *Id.* at 172, 603 *A*.2d at 504. We modified our holding in *Buckley* as follows.

> First, an intoxicated patron may no longer avoid responsibility for injuries proximately caused by his or her voluntary decision to consume alcohol to the point of intoxication. Second, once a jury determines that a tavern continued to serve drinks to a visibly-intoxicated patron, the jury should not be instructed, absent exceptional circumstances, to determine the extent to which the patron retained some capacity to appreciate the risk of engaging in the activity that led to the accident. If a tavern serves alcohol to a visibly-intoxicated patron, a court will ordinarily presume the patron's lack of capacity to evaluate the ensuing risks.
>
> [*Id.* at 184, 603 *A*.2d at 510.]

Thus, we struck a balance between the unfairness of the *Soronen* rule, which could potentially lead to holding a tavern 100% liable where it was only 1% responsible, and the confusion surrounding the application of the *Buckley* factor, *i.e.,* the plaintiff's ability to appreciate the risk of engaging in the activity that led to the accident.

Comparative negligence was still an available defense after *Lee,* but ordinarily a plaintiff's decision to engage in conduct after the point of intoxication would not be evidence of the plaintiff's own negligence. That is because in the ordinary case a jury instructed to evaluate whether a plaintiff could appreciate the risk of driving while intoxicated would tend to focus on the plaintiff's voluntary intoxication and not the defendant's act of serving the visibly-intoxicated patron.

■ In *Lee,* we recognized that the proper inquiry should focus on the decision to drive (or to accompany an intoxicated driver). We reasoned that the best way to ensure that a jury would distinguish a plaintiff's conduct in becoming intoxicated from that plaintiff's conduct in deciding to drive (or to accompany an intoxicated driver) while intoxicated was to instruct the jury that a comparative-negligence defense cannot be based on the decision to

drive (or to accompany an intoxicated driver). In other words, in the ordinary case, once a defendant is found to have been negligent, that defendant bears the responsibility for the plaintiff's decision to drive (or to accompany an intoxicated driver). That responsibility may be diminished only to the extent that the plaintiff's drinking prior to the point of intoxication contributed to his or her inability to appreciate the risk of his or her behavior. *Id.* at 187, 603 *A*.2d at 511.

## IV

Plaintiff argues that the trial court's charge to the jury on comparative negligence unfairly emphasized decedent's negligence in drinking and driving after the point of intoxication. Plaintiff contends that the trial court's instructions on comparative negligence impermissibly informed the jury that it should find decedent negligent if she retained some ability to appreciate the risk of driving in an intoxicated state and yet decided to drive. Plaintiff maintains that this Court's decision in *Lee, supra,* explicitly prohibits a trial court from instructing a jury that an intoxicated patron's decision to drive is evidence of negligence. According to plaintiff, *Lee* requires trial courts to instruct jurors that once they find that a defendant served a visibly-intoxicated person, they should presume that the intoxicated person lacked the capacity to evaluate the risk of driving while intoxicated. In other words, in the face of defendant's negligence, decedent's decision to drive after the point of intoxication cannot be evidence of her contributory negligence.

In this case, the trial court did not have the benefit of our decision in *Lee* before it charged the jury. As a result, it instructed the jury in accordance with the Appellate Division's decision in *Lee* and our decision in *Buckley*. Specifically, the trial court instructed the jury as follows on the issue of comparative negligence.

We talk about her negligence as terms of comparative negligence or contributory negligence and let me address that for a moment. * * *

When I say a reasonably prudent person I mean not the most cautious person in the world or somebody who is unusually bold, but a person of reasonable caution and prudence. And you must determine whether Mrs. Lapollo has conformed to or departed from that standard of care. A driver is not absolved from responsibility by virtue of voluntary intoxication. A drunk driver can be responsible for the accident if the driver fails to exercise reasonable care for her own safety. *An intoxicated driver's circumstances are to be assessed by you in order to determine whether and to what extent that person's appreciation of the risk was still effective, notwithstanding some level of inebriation. So you want to think about to what extent was Mrs. Lapollo's rational decision making ability impaired by intoxication; did she retain some ability to appreciate that she was not fully capable of operating a vehicle. If and if she retained the accident (sic) one degree or another to appreciate her limitations due to liquor, and yet she voluntarily exposes herself to a manifest danger which she otherwise could and indeed a sober person in the exercise of ordinary foresight and prudence would have avoided, then she would be guilty of comparative or contributory negligence.*

Remember what you are assessing are the relative degrees of responsibility for the claim that Mrs. Lapollo got drunk because of that intoxication, drove into a one car fatal accident; the licensed beverage server is responsible for consequences of the accident if the server causes the drinker, here Mrs. Lapollo, to fail to control her own actions or appreciate the risk surrounding her conduct, and of course she is responsible for her own acts to the extent that she could appreciate the limitations and despite those limitations caused by drinking decided to get into the car and drive anyway.

[Emphasis added.]

Like the Appellate Division, we agree with plaintiff that the trial court's comparative-negligence charge did not adhere to the outline we provided in *Lee* for the *ordinary* dram-shop case. The trial court did not instruct the jury to presume that plaintiff's decedent lacked the capacity to evaluate the ensuing risks of driving while intoxicated. Instead, the court instructed the jury to determine whether plaintiff's decedent had retained the ability to appreciate the risks associated with driving in her condition. If the jury concluded that she had retained the capacity to appreciate the risk, it should find that she had been contributorily negligent.

## V

But this is not an ordinary case. Here, "exceptional circumstances" existed. Decedent, the tavern's bartender, served

herself. She did so despite her obligation not to drink at all while on duty. Additionally, she had been trained in alcohol management and knew, more so than the average patron, the signs and ramifications of intoxication. Such training as well as her occupational experience had equipped decedent with an increased ability to assess the progression of intoxication and to understand the debilitating effect of excessive drinking. *See Kelly v. Gwinnell,* 96 *N.J.* 538, 565, 476 *A.*2d 1219, 1233 (1984) (acknowledging that experience of alcoholic beverage licensees and their employees gives them certain expertise in determining levels and degrees of intoxication) (Garibaldi, J., dissenting). We did not intend that the presumption we established in *Lee* would apply to the circumstances of this case. That is precisely why we were careful in *Lee* to explain that a court should not instruct the jury to determine the extent to which the patron had retained some capacity to appreciate the risk of engaging in the activity that led to the accident, "*absent exceptional circumstances.*" 127 *N.J.* at 184, 603 *A.*2d at 510 (emphasis added). Moreover, we stated that a court should "*ordinarily* presume the patron's lack of capacity to evaluate the ensuing risks." *Ibid.* (emphasis added). We find the circumstances of this case to be exceptional, such that the trial court's failure to instruct the jury on the *Lee* presumption was not erroneous.

The unmistakable corollary to our holding in *Lee* is that if "exceptional circumstances" exist, a jury should consider the "extent to which the patron retained some capacity to appreciate the risk of engaging in the activity that led to the accident." 127 *N.J.* at 184, 603 *A.*2d at 510. Because of the "exceptional circumstances" of this case, the trial court's instruction to the jury to that effect was entirely appropriate. It correctly applied the *Buckley* standard to the peculiar facts of the case and did not mislead the jury. *See Vadurro v. Yellow Cab Co.,* 6 *N.J.* 102, 107–08, 77 *A.*2d 459, 461–62 (1950) (holding that "acid test" for reviewing jury instructions is whether jury could have been misled); *see also Latta v. Caulfield,* 79 *N.J.* 128, 135, 398 *A.*2d 91, 94–95 (1979)

(finding that "[r]eversible error will not be found where the charge, considered as a whole, adequately conveys the law and would not confuse or mislead the jury, even though part, standing alone, might be incorrect"); *Jurman v. Samuel Braen, Inc.*, 47 *N.J.* 586, 591–92, 222 *A.*2d 78, 80–81 (1966) (stating that jury charge "must outline the function of the jury, set forth the issues, correctly state the applicable law in understandable language and plainly spell out how the jury should apply the legal principles to the facts as it may find them").

 Given the fact that the *Lee* presumption is inapplicable to this case, plaintiff's contention that we should remand this case because of our intervening decision in *Lee* is meritless. Had we decided *Lee* prior to the jury instruction in this case, we would not have altered the substance of the jury instruction. The trial court would have had to determine first whether "exceptional circumstances" existed. After determining that "exceptional circumstances" did exist, the trial court would have had to instruct the jury precisely as it did on comparative negligence. Our decision in *Lee* would have had no effect on the substance of the jury charge; therefore, to allow *Lee* to be the basis of a reversal and remand would have been pointless. Courts uphold even erroneous jury instructions when those instructions are incapable of producing an unjust result or prejudicing substantial rights. *See Terminal Constr. Corp. v. Bergen County Hackensack River Sanitary Sewer Dist. Auth.*, 18 *N.J.* 294, 315, 113 *A.*2d 787, 798 (1955) (holding that unless error in jury instruction was prejudicial to party's substantial rights, no reason exists to reverse trial court); *Lang v. Baker*, 195 *N.J.Super.* 430, 434, 480 *A.*2d 216, 218 (App. Div.1984) (holding that error in instructing jury on controlling law that has no capacity to lead to unjust result is harmless), *rev'd on other grounds*, 101 *N.J.* 147, 501 *A.*2d 153 (1985); *Jorgensen v. Pennsylvania R.R. Co.*, 38 *N.J.Super.* 317, 339, 118 *A.*2d 854, 866 (App.Div.1955) (holding that erroneous jury instruction does not require reversal unless error is prejudicial because inconsistent

with substantial justice), *certif. denied,* 20 *N.J.* 308, 119 *A.*2d 791 (1956).

## VI

This case involved a tragic accident. Because plaintiff and her family have had to bear the full burden of the tragedy, they have a natural tendency to resist assigning blame to the decedent. She was, after all, the victim of the accident. Yet, we know that she was also the victim of her own conduct. "Our statutory and case law reflect the compelling public policy that those who voluntarily become intoxicated must be held responsible for the consequences of their behavior." *Lee, supra,* 127 *N.J.* at 182, 603 *A.*2d at 509.

As Justice O'Hern eloquently stated in *Buckley,* "In a self-governing society, law derives much of its normative force from acceptance and understanding of the justness of its principles." 101 *N.J.* at 82, 500 *A.*2d at 711 (O'Hern, J., concurring). Here, the jury reached a just result in accordance with the applicable law. We see no reason to disturb that result.

Judgment affirmed. No costs.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7. join in this opinion.

*Opposed*—None.