288 N.J. Super. 304 (1996)
672 A.2d 253
NALDY PETITTO, PLAINTIFF-APPELLANT/CROSS-RESPONDENT,
v.
SANDS HOTEL & CASINO, INC., DEFENDANT-RESPONDENT/CROSS-APPELLANT, AND LYNN KORN, LISA WILLIAMS AND JOHN DOES 1-10, JOINTLY, SEVERALLY AND IN THE ALTERNATIVE, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Submitted January 23, 1996.
Decided March 14, 1996.
*306 Before Judges PRESSLER, KEEFE and A.A. RODRIGUEZ.
Jacobs & Barbone, attorneys for appellant/cross-respondent (Louis M. Barbone, on the brief).
Youngblood, Corcoran, Aleli, Lafferty & Stackhouse, attorneys for respondent/cross-appellant (Randolph C. Lafferty, of counsel; Phyllis Coletta, on the brief).
The opinion of the court was delivered by KEEFE, J.A.D.
Plaintiff Naldy Petitto was involved in a one car motor vehicle accident in the evening hours of January 21, 1989. A chemical analysis of her blood performed shortly after the accident revealed a .215 blood alcohol content. Plaintiff instituted suit against defendant Sands Hotel & Casino (Sands), claiming that Sands was *307 liable for her injuries because it allegedly served her alcoholic beverages after she became visibly intoxicated.[1] Sands denied liability for plaintiff's injuries. It claimed that it did not serve plaintiff when she was visibly intoxicated, and that plaintiff became intoxicated after she left Sands. Alternatively, Sands claimed that, if it was found liable to plaintiff, her damages should be diminished due to her negligence in failing to wear a seat belt.
In response to special interrogatories, the jury found that Sands did serve alcoholic beverages to plaintiff when she was visibly intoxicated, and that its doing so was a proximate cause of the auto accident. The jury also found that plaintiff was negligent in becoming intoxicated, and that such negligence was a proximate cause of the auto accident. Comparative fault for the accident was allocated at 50% each. Without regard to the apportionment of fault, the jury awarded plaintiff $50,000 for her pain, suffering and disability.
As to the seat belt damage defense, the jury found that plaintiff was not wearing a seat belt and was negligent in failing to do so. It assessed 60% as the plaintiff's fault for that negligence, and further found that plaintiff's damages would have been only $20,000 had she been wearing the seat belt. Thereafter, the judge molded the verdict and entered judgment in favor of plaintiff in the amount of $16,000 plus interest.[2] Plaintiff moved for a new trial on the issue of damages, or an additur. Defendant moved for a new trial on all issues if the trial court was inclined to grant any *308 relief to plaintiff. Both motions were denied, and this appeal followed.
On appeal, plaintiff contends that she is entitled to a new trial on the issue of general damages on the ground that the award was so shockingly disproportionate to the injuries sustained that a miscarriage of justice occurred. Plaintiff also contends that the trial judge erroneously instructed the jury on the seat belt damage issue and that she was prejudiced by that error. Defendant cross-appeals from the denial of its motion for a new trial on all issues, but presses its appeal as to a new trial on liability only if we grant a new trial on damages.
We reverse the general money damage award as being grossly insufficient and a miscarriage of justice. We also find that the judge erred on the seat belt defense under the circumstances of this case. Additionally, we deny Sands' cross-appeal seeking a new trial on general liability. Suffice it to say that while there were many factual disputes concerning where plaintiff drank, how long she drank, and how much she drank, there was sufficient evidence in the record from which the jury could find that plaintiff was served alcohol at Sands after she became visibly intoxicated and that such conduct was a proximate cause of plaintiff's injuries. Dolson v. Anastasia, 55 N.J. 2, 6-8, 258 A.2d 706 (1969). As to the other issues raised by Sands alleging that a new trial on liability is warranted, we find them to be without merit and conclude that a written opinion on those issues would have no precedential value. R. 2:11-3(e)(1)(E). Therefore, we shall discuss only those issues which require reversal.

I
A new trial on damages should not be granted "unless it is so disproportionate to the injury and resulting disability as to shock the court's conscience and convince it that to sustain the award would be manifestly unjust." Tronolone v. Palmer, 224 N.J. Super. 92, 97, 539 A.2d 1224 (App.Div. 1988) (citing Baxter v. Fairmont Food Co., 74 N.J. 588, 596, 379 A.2d 225 (1977)). *309 Although an appellate court must defer to the trial judge on witness credibility, demeanor, and "feel of the case," it determines for itself whether the record shows that there was a miscarriage of justice. Dolson, supra, 55 N.J. at 7, 258 A.2d 706. We are charged with the responsibility of diligently scrutinizing and carefully weighing the record, mindful of the caution not to become the "thirteenth and decisive juror." Id. at 6, 258 A.2d 706. Having observed these principles, we are clearly convinced that an award of $50,000 for the injuries sustained by plaintiff is so grossly inadequate that a miscarriage of justice occurred. R. 2:10-1.
Dr. Iliff, one of plaintiff's treating physicians, testified by videotape. He is a specialist in oculoplastic surgery, the Director of the Division of Oculoplastic Surgery at Johns Hopkins Medical Center and an Associate Professor of Plastic Surgery and Ophthalmology.
Dr. Iliff first saw plaintiff approximately six months after the accident. She reported that she had been in an auto accident, and that she had fracture repairs to her left orbit and skull with the insertion of a plate, as well as some plastic surgery to her nose. Dr. Iliff confirmed the presence of the fractures and the presence of the plate through subsequent X-ray studies prior to performing surgery on her. He was also later able to see that the plate inserted to repair her orbit fracture had caused scar tissue, thereby complicating his attempt to correct an abnormality in plaintiff's left lower eyelid. The orbit fracture also pierced the thin plate separating the left sinus from the left eye cavity, causing the eye to sink backward into the sinus cavity.
At the time of the initial examination, plaintiff complained of double vision. Objective tests performed by technicians under Dr. Iliff's supervision confirmed that damage to the muscles surrounding the left eye caused plaintiff to have double vision on upward, downward and left gazes. Dr. Iliff's examination revealed a drooping of the left upper eyelid and left lower lid. The eye also had a sunken appearance and was a tenth of an inch or so lower than the right eye. He characterized his findings as "quite apparent" and "quite observable." Dr. Iliff also observed that *310 plaintiff's nose was "a little bit over towards the right," and there was some scarring on the edge of her nose and on her lip.
The first surgery was performed by Dr. Iliff in August 1989. Between that date and September, 1991, when Dr. Iliff last saw her, plaintiff had four additional surgeries in an effort to correct the damage to the structure of the eye and the double vision. The third surgery, involving repair to the upper eyelid, required plaintiff to be awake with only the benefit of local anesthesia. During one of the procedures, another plastic surgeon, working simultaneously with Dr. Iliff, performed additional plastic surgery on plaintiff's nose which required some cartilage to be removed from her ear. While Dr. Iliff believed that his surgeries were quite successful, he acknowledged that some further corrective surgery was still required on the upper and lower eyelid.
The defense examining physician, Dr. DiMauro, also testified by videotape. Dr. DiMauro is board certified in otolaryngology and plastic and reconstructive surgery. He examined plaintiff on January 16, 1992, and had reviewed medical records pertaining to her treatment before that time. He observed a 2.5 centimeter scar on the left upper eyelid, an "almost invisible" 4 centimeter scar on the left border of the nose, and a hypopigmented and depressed.5 centimeter by 2 centimeter scar proceeding from the nose to the left upper lip. He opined that the scar on the upper lip would be amenable to further surgery "with some improvement," and "obviously" corrective surgery was still required on the left eye.
There was no disagreement as to the nature of plaintiff's rather extensive facial injuries, their relationship to the motor vehicle accident, the need for the extensive surgeries that plaintiff experienced, or the residuals from those surgeries. The defense expert admitted that plaintiff had further surgeries to look forward to if she wanted additional improvement, and admitted there might be some residual scarring. Even if the jury discounted entirely plaintiff's complaints of pain and suffering, a result that could not be justified in light of the uncontradicted medical testimony, the *311 jury verdict was woefully inadequate based on the medical testimony alone. To say that the jury award for the pain, suffering, and disability resulting from these injuries was, in the words of the trial judge, "conservative" is an understatement. We are clearly convinced that the jury's evaluation was skewed by irrelevant factors, having no bearing on the nature of plaintiff's damages, and that the verdict was manifestly unjust. Plaintiff is entitled to a new trial on the issue of damages.

II
Where a defendant produces sufficient testimony to raise a seat belt defense, the jury must, among other things, determine whether the plaintiff was negligent for failing to wear the seat belt. Waterson v. General Motors Corp., 111 N.J. 238, 272, 544 A.2d 357 (1988). That negligence must be considered by the jury "independent of any possible negligence contributing to the accident," and the standard to be applied to judge the plaintiff's conduct is that of "the reasonably prudent person." Ibid.
Thus, in a hypothetical case in which the plaintiff elects to consume alcoholic beverages, without the aid or assistance of a dram-shop licensee, and operates a motor vehicle thereafter without a seat belt, the extent of the plaintiff's impairment would be one of the factors bearing on the plaintiff's negligence in failing to wear the seat belt. However, the analysis becomes more complicated when, as in this case, a dram-shop defendant has breached a duty to a customer by serving her alcoholic beverages after she became visibly intoxicated. In such cases, "ordinarily a plaintiff's decision to engage in conduct after the point of intoxication would not be evidence of the plaintiff's own negligence." Fisch v. Bellshot, 135 N.J. 374, 388, 640 A.2d 801 (1994). Therefore, inasmuch as plaintiff's decision not to wear the seat belt was not made until after "the point of intoxication," fault ordinarily should not be attributed to her in respect of that decision. That is so because, if the jury may not attribute fault to the plaintiff for her *312 decision to drive, it certainly cannot attribute fault to her for her decision not to wear a seat belt.
However, in cases involving "exceptional circumstances," the court may instruct the jury to consider the "extent to which the patron retained some capacity to appreciate the risk of engaging in the activity that led to the accident[.]" Id. at 391, 640 A.2d 801 (quoting Lee v. Kiku Restaurant, 127 N.J. 170, 184, 603 A.2d 503 (1992)). But, in the absence of such circumstances, there is a presumption that the patron "lacked the capacity to evaluate the ensuing risks of driving while intoxicated." Fisch, supra, 135 N.J. at 390, 640 A.2d 801.
In Fisch, the Court found exceptional circumstances based on the following factors: 1) plaintiff's decedent was an employee of the dram-shop and served herself the drinks that led to her visible intoxication; 2) the decedent also violated the dram-shop's policy of drinking while on duty; and 3) the decedent had taken and passed a "state training and alcohol management course." Id. at 378-380, 640 A.2d 801. Although the trial judge found that exceptional circumstances existed in this case, we disagree. Plaintiff was a business patron of Sands at the time, not an employee. Further, employees of Sands served her alcoholic beverages after she was visibly intoxicated; plaintiff did not serve herself.
Plaintiff's training as a one-time casino bartender and server of drinks is insufficient standing alone to rebut the presumption ordinarily applied in such cases. To do so would unnecessarily diminish the obligation of dram-shop licensees in such circumstances. In reality, plaintiff's understanding of the dangers of alcohol consumption and operating a motor vehicle were not appreciably greater than an ordinary citizen. Therefore, on remand, there shall be no mitigation for seat belt damages.
In conclusion, the liability verdict and apportionment of fault for the happening of the accident is affirmed. However, the jury verdict on general damages is reversed, as is the jury's allocation of negligence and percentage of fault with respect to the seat belt defense. We remand for a new trial solely on the issue of *313 plaintiff's general damages. The trial judge shall reduce that verdict by 50% to arrive at a molded final judgment.
NOTES
[1] Other parties were named as defendants, but the judgment under review was entered only against the Sands.
[2] The calculation is as follows:

Seat belt damages: 1) $50,000 (full verdict) less $20,000 (damages if seat belt had been used) = $30,000 (full seat belt damages). 2) $30,000 less 50% (plaintiff's general liability fault) = $15,000. 3) $15,000 less 60% (plaintiff's percentage of seat belt fault) = $6,000 (net seat belt damage award).
General damages: $20,000 (damages had seat belt been worn) less 50% (plaintiff's general liability fault) = $10,000.
Total damages: $6,000 (net seat belt damages) + $10,000 (net general damages) = $16,000.