962 A.2d 1103

DIANE M. MAZZACANO, ADMINISTRATRIX AD PROSEQUENDUM AND GENERAL ADMINISTRATRIX OF THE ESTATE OF STEPHEN N. MIKALIC, DECEASED, PLAINTIFF–APPELLANT, v. THE ESTATE OF JOHN A. KINNERMAN, DECEASED, RITCHIE & PAGE, DISTRIBUTING CO., INC., ANHEUSER–BUSCH, INC., STEPHEN JOHN KANICKIJ, JOHN DOE AND JANE DOE, FICTITIOUS INDIVIDUALS, DEFENDANTS, AND HAPPY HOUR SOCIAL AND ATHLETIC CLUB OF MAPLE SHADE, INC., DEFENDANT–RESPONDENT.

Argued October 6, 2008—Decided January 22, 2009.

*Kenneth D. McPherson, Jr.,* argued the cause for appellant (*Waters, McPherson, McNeill,* attorneys; *Mr. McPherson, Eric D. McCullough* and *Robert S. Lipschitz,* on the brief).

*Terrence J. Bolan* argued the cause for respondent (*Bolan Jahnsen Reardon,* attorneys; *Elizabeth A. Wilson,* on the brief).

Justice ALBIN delivered the opinion of the Court.

In this case, defendant Happy Hour Social and Athletic Club of Maple Shade, Inc. (Happy Hour Social and Athletic Club or the Club) was issued a limited permit to dispense alcohol at its yearly "Pig Roast" picnic. Guests were able to serve themselves beer from a tap in a specially-provisioned truck for the occasion. At the end of the picnic, one of the guests, while driving three others to a sports bar, lost control of his car, causing the deaths of all four. At a civil wrongful death trial brought under the New Jersey Licensed Alcoholic Beverage Server Fair Liability Act (Dram Shop Act), *N.J.S.A.* 2A:22A–1 to –7, a jury found the Club

not liable for the accident, apparently because the driver of the doomed vehicle did not appear to be visibly intoxicated when he left the picnic.

The trial court had charged the jury that if the Club *allowed* the service of alcohol to a visibly-intoxicated person, then liability would follow, provided that the service of the alcohol was the proximate cause of the victims' injuries and deaths. The trial court rejected the theory that the Club had an independent duty under the Dram Shop Act to monitor the guests serving themselves beer and that the failure to do so, standing alone, could be the basis for liability. A divided appellate panel affirmed the trial court's rulings and the jury verdict.

A dissenting panel member concluded that the Club had a duty to monitor its guests and, because of the absence of such monitoring, the trial judge should have charged the jury that it was free to infer that the driver of the vehicle served himself while visibly intoxicated. Because the Dram Shop Act is the "exclusive civil remedy for personal injury ... resulting from the negligent service of alcoholic beverages," *N.J.S.A.* 2A:22A–4, we reject the dissenter's invitation to impose a judicially-created monitoring duty that is not set forth in that statute. We affirm the appellate panel, but emphasize that the Dram Shop Act provides a powerful incentive to a social club to monitor its guests at an affair, because if such a club *allows* the self-service of alcohol to a visibly-intoxicated guest or patron who then causes an automobile accident proximately related to his intoxicated condition, it can be held accountable under the Act.

I.

A.

Defendant Happy Hour Social and Athletic Club is a non-profit organization, which was formed for the purpose of "help[ing] community kids." The Club has approximately 115 members, all

male, and owns a building equipped with a private bar, resting on 5.4 acres of land in Maple Shade. The Club holds a liquor license.

In keeping with an annual tradition, on August 17, 2002, the Club hosted an outdoor "Pig Roast" on its property, with the proceeds to benefit community athletic teams. The event was open to the general public at a charge of twenty dollars per person. Both food and beverages, including beer, were available at the picnic.

The Club arranged for beer to be supplied by Ritchie & Page Distributing Co., Inc. (Ritchie & Page), a licensed, New Jersey wholesaler of beer products manufactured by Anheuser–Busch, Inc. At the picnic, Ritchie & Page provided a refrigerated "beer truck," which contained five half-sized kegs with three taps located outside the vehicle. In advance of the Pig Roast, the Club also obtained from the New Jersey Division of Alcohol Beverage Control a "social affair permit" that allowed for the service of alcohol at the event.[1] In its application for the permit, the Club submitted a sketch of a "beer truck" and two stick figures next to the truck, accompanied by a handwritten notation: "two club members checking IDs." [2]

Approximately 175 people, including children, attended the Pig Roast, which began at 1:00 p.m. Stephen John Kanickij, an employee of Ritchie & Page, drove the "beer truck" to the event and made "sure everything [was] running properly." Beer was

[1] A social affair permit "authorize[s] the sale of alcoholic beverages by the glass or other open receptacle by civic, religious, educational, veterans or other qualified organizations ... notwithstanding that the sale of alcoholic beverages has otherwise been prohibited by [statute] or municipal ordinance or resolution." *N.J.S.A.* 33:1–74(c) (citations omitted); *see also N.J.A.C.* 13:2–5.1. The fee for such a permit is statutorily set. *N.J.S.A.* 33:1–74(a). The Maple Shade municipal clerk's office approved the Club's application for the permit.

[2] The permit limited the service of alcohol at the event to the hours of 1:00 p.m. to 6:00 p.m. and prohibited the Club from allowing the service or consumption of alcohol "directly or indirectly" to "any person ... who is actually or apparently intoxicated."

available on a self-serve basis from taps outside of the truck. Kanickij did not believe that he had any responsibility to monitor the intake of alcohol by those attending the Pig Roast. The Club's president, Robert Wojahowski, did not assign club members to stand by the beer truck to check identification or to determine if a patron was visibly intoxicated. Nor did the Club hire police officers or private security guards to monitor alcohol consumption. In the past, if a guest "got out of hand," Wojahowski would simply call the police.

John A. Kinnerman, age 34, arrived at the picnic at approximately 1:00 p.m. Over the next five hours, Kinnerman was observed at least once at the beer truck, but no one remembered him drinking alcohol. By various accounts, from the time of his arrival at the party until he departed at approximately 6:40 p.m., Kinnerman did not appear to be visibly intoxicated. William Natale, who observed Kinnerman at 3:00 p.m., found nothing about Kinnerman's appearance suggesting intoxication. Kinnerman's mother last saw him at 5:20 p.m. and did not consider him to be under the influence. Last, Kevin Jacoby witnessed Kinnerman leave the party and enter his car and, in his estimation, Kinnerman did not appear intoxicated.

Kinnerman left the Pig Roast with three other people who attended the party, their destination a local sports bar. Stephen N. Mikalic, age 45, an investigator at the Camden County Prosecutor's Office, Michael McMullen, and John Meloni took passenger seats in Kinnerman's 1971 Ford Mustang, which was equipped with racing tires.[3] Kinnerman, who was an experienced, high-performance driver with a reputation for racing through Maple Shade at speeds in excess of 100 miles per hour, got behind the wheel. Kinnerman raced the Mustang, accelerating to a speed of ninety miles per hour. About a quarter mile from the picnic site, he lost control of the car, which crossed over the center divider. Kinnerman's car hit a van traveling in the opposite direction, and

---

[3] The car was also described as a "1971 Ford Mach."

then flipped over. All four men in the Mustang were killed, and the driver of the van was seriously injured.

An autopsy later revealed that Kinnerman's blood alcohol content (BAC) was 0.181 percent at the time of his death, almost twice as high as the then-permissible BAC limit in 2002 under *N.J.S.A.* 39:4–50. *See L.* 2001, *c.* 12, § 1.[4] By contrast, Mikalic's BAC was 0.085 percent, a level below the then legislatively defined BAC limit.

At trial, David Pandina, Ph.D., a toxicology expert, testified that Kinnerman "was certainly under the influence of alcohol" at the time of the accident. Pandina concluded that Kinnerman's 0.181 BAC reading indicated that he had consumed the equivalent of thirteen twelve-ounce glasses of beer over a period of four-and-one-half hours or nine twelve-ounce glasses within an hour of the accident. Pandina formed an opinion, within a reasonable degree of probability, that Kinnerman was "visibly intoxicated" at the party. Pandina reached that hypothesis based on studies that at a 0.15 BAC "the vast majority of people will show signs and symptoms" of intoxication. He conceded, however, that even at that BAC level "a very small percentage" would not appear visibly intoxicated, and that it was possible that some people with a 0.20 BAC level might not "seem visibly intoxicated."

## B.

The victims' families as well as the injured driver of the van instituted civil actions against Kinnerman's estate, the Happy Hour Social and Athletic Club and other parties as a result of the tragic accident. This appeal involves only the amended wrongful death and survival action filed by plaintiff Diane M. Mazzacano, the widow of Stephen N. Mikalic, against Kinnerman's estate, the

---

[4] In 2002, at the time of the accident, the legal BAC limit for operating a motor vehicle in New Jersey was 0.10 percent. *See L.* 2001, *c.* 12, § 1. The legal level of intoxication was lowered in 2004 to 0.08 percent. *See L.* 2003, *c.* 314 (codified at *N.J.S.A.* 39:4–50).

Club, Anheuser–Busch, Inc., Ritchie & Page, and its employee, Kanickij. Plaintiff's complaint sought damages against Kinnerman's estate based on Kinnerman's negligent operation of his car and damages against the Club, Ritchie & Page, Kanickij, and Anheuser–Bush based on the negligent service of alcohol to Kinnerman in violation of the Dram Shop Act. At the pre-trial stage, Anheuser–Busch was dismissed from the case, and plaintiff settled with Kinnerman's estate.

The case proceeded to trial before a jury against the remaining defendants. At the conclusion of plaintiff's presentation, the court dismissed Ritchie & Page and Kanickij from the case on the ground that the beer distributor was merely a "middleman delivering [a] product" and, in that capacity, had no statutory or common law duty to monitor the consumption of beer at the party. Thus, the Happy Hour Social and Athletic Club was left as the sole defendant.

Although the court allowed considerable testimony concerning the social affair permit, it did not grant plaintiff's request that the permit itself be introduced into evidence. The court ruled so because the language on the permit, which prohibited service of alcohol "to any person who is actually or apparently intoxicated," differed from the negligence standard under the Dram Shop Act, which makes the server of alcohol liable only when "the server served a visibly intoxicated person, or served a minor." *N.J.S.A.* 2A:22A–5(b).

Before it deliberated, the jury was instructed on the applicable law under the Dram Shop Act. The court advised the jury:

If you find that the Happy Hour Social & Athletic Club of Maple Shade provided, served, or *allowed* to be provided alcoholic beverages to a person when that person was visibly intoxicated, then you must find that the [Club] was negligent. If you find that the [Club] did not serve or *allow* or provide alcoholic beverages to a visibly intoxicated person, then it was not negligent.

[ (Emphasis added).]

The court defined "visibly intoxicated" as "a state of intoxication accompanied by a perceptible act or series of acts which present

clear signs of intoxication," and instructed the jury on proximate cause.

During its deliberations, the jury posed the following question to the court: "As per obtained permit, does the club have the responsibility to monitor alcohol consumption?" The court responded that the permit was not in evidence, and recharged the jury on the law under the Dram Shop Act. In particular, the court reminded the jury that "[i]f you find that the Happy Hour Social & Athletic Club of Maple Shade allowed Mr. Kinnerman to consume alcoholic beverages when he was visibly intoxicated, then you must find the [Club] was negligent." The jury, by a vote of seven to one, returned a verdict in favor of the Club, finding that it did not "negligently provide alcoholic beverages to [Kinnerman] while [he] was visibly intoxicated." [5] The court then entered judgment dismissing the cause of action against the Club. The court denied plaintiff's motion for a new trial, finding no basis to reverse its prior legal rulings and finding that the verdict was not against the weight of the evidence.

## C.

In an unpublished opinion, a divided appellate panel affirmed. First, the panel (two-judge majority) acknowledged that, based on the evidence, the jury was free to conclude, from the absence of servers at the Pig Roast, that "Kinnerman's intoxication, if visible, would more likely have gone unobserved." Indeed, the panel noted that the Club did not argue that "if Kinnerman was visibly intoxicated [it] could escape liability because there were no servers to observe his condition." it noted that the parties did not dispute the standard for liability under the Dram Shop Act, both agreeing that "the Club would be liable if Kinnerman obtained alcohol while visibly intoxicated." The panel, however, rejected the dissent's suggestion that the Act imposed an obligation on the trial court to

---

[5] Because of this finding, there was no need for the jury to address any of the remaining interrogatories dealing with proximate cause and damages.

"instruct the jury about a separate duty to monitor consumption." The Legislature spoke clearly, according to the panel, that the only basis for liability under the Dram Shop Act is if a guest or patron is provided alcohol when " 'visibly intoxicated.' "

Second, the panel concluded that the verdict was not against the weight of the evidence. It emphasized that several persons attending the Pig Roast did not observe any sign that Kinnerman was intoxicated; that "[t]here was some testimony that Kinnerman could drink without showing signs of intoxication"; and that the three victim passengers, who "apparently" were not intoxicated, got into the car with Kinnerman. The jury, the panel held, was free to accept that evidence and other supportive inferences.

Last, the panel recognized that "because the jury found Kinnerman was not visibly intoxicated," there was no basis to infer liability against Ritchie & Page and therefore no need to consider whether, under other circumstances, Ritchie & Page, which was "not licensed to serve alcoholic beverages," could be held liable under the Dram Shop Act.

The dissenting judge believed that in cases involving the self-service of alcohol, such as the present one, the Dram Shop Act had an "evident gap," which the court "can and should fill." Although the dissenter found it commendable that the trial court advised the jury that it could hold the Club liable if the Club " 'allowed to be provided alcoholic beverages to a visibly intoxicated person,' " he still concluded that the Club should not "escape liability by having no one in place through whom to impute the requisite knowledge of visible intoxication." In his view, the trial court had the obligation to "instruct[ ] the jury that [the Club] did indeed have a 'responsibility to monitor alcoholic consumption.' " That duty, according to the dissenter, "is entirely consistent with ... the legislative objectives reflected in the Act." In his opinion, "if the jury found that [the Club] had failed to meet its responsibility, the jury should have been instructed that it was free to infer that Kinnerman's intoxication could have been observed if the alcohol

consumption had been properly monitored." [6]   Last, the dissenter would have decided that Ritchie & Page was not subject to the Dram Shop Act because it was not a licensed server and because it had no common law duty to monitor alcohol consumption at the picnic.

Based on the dissent in the Appellate Division, plaintiff filed an appeal as of right. *R.* 2:2–1(a)(2); *see Gilborges v. Wallace*, 78 *N.J.* 342, 349, 396 *A.*2d 338 (1978) ("[T]he scope of the appeal ... is limited to those issues encompassed by the dissent."). We denied plaintiff's petition for certification, declining to review the appellate panel's holding that Ritchie & Page was not liable under common law negligence principles. *Mazzacano v. Happy Hour Social & Athletic Club of Maple Shade, Inc.*, 194 *N.J.* 267, 944 *A.*2d 28 (2008). Therefore, the only issue before this Court is whether the trial court erred in not instructing the jury that a licensed alcoholic beverage server could be held liable under the Dram Shop Act for *failing to monitor* a patron who becomes intoxicated at a party involving the self-service of alcohol.

## II.

Plaintiff Diane Mazzacano basically argues that because a licensed alcoholic beverage server is only negligent under the Dram Shop Act when a visibly-intoxicated patron is served alcohol, the Act necessarily presupposes that the server will actually observe the person who is served alcohol.  From that simple premise, she reasons that the Legislature could not have intended that a licensed alcoholic beverage server would escape liability when failing to monitor the self-service of alcohol at a party, particularly given the significant and foreseeable risks posed by drunk drivers. She therefore submits that the trial court wrongly refused to

---

[6] The dissenting judge "agree[d] with the majority that the [social affair] permit was not admissible because it referenced a standard that was at variance with the Dram Shop."

charge the jury that the Happy Hour Social and Athletic Club had a duty to monitor the intake of alcohol by guests at the Pig Roast.

In contrast, defendant Happy Hour Social and Athletic Club contends that the Dram Shop Act, which is the exclusive civil remedy for the negligent service of alcohol by a licensed server, does not provide an independent basis for liability for failure to monitor. The Club concedes that the self-service of alcohol at the Pig Roast constituted the service of alcohol by the Club. Significantly, the Club did not object to the court's jury charge, which stated that if it allowed Kinnerman to serve alcohol to himself while he was visibly intoxicated, it would be negligent and therefore liable for the accident, provided plaintiff proved the additional elements of proximate cause and foreseeability. The Club's main defense was that Kinnerman was not visibly intoxicated when he left the Pig Roast. The Club urges the Court not to judicially impose, as a basis for civil liability, a duty of monitoring that does not appear in the Dram Shop Act.

In determining whether the Act imposes civil liability on a licensed alcoholic beverage server for not monitoring the self-service of alcohol at a party, we turn first to the text of the statute and then to the statute's policy objectives, which are set forth in the Act itself.

### III.

### A.

The New Jersey Licensed Alcoholic Beverage Server Fair Liability Act, *N.J.S.A.* 2A:22A–1 to –7, known more commonly as the Dram Shop Act,[7] is "the *exclusive* civil remedy for personal

---

[7] The term "dram shop" was first used in the 1830s to describe inns where "liquor was sold in quantities of less than a gallon." Jana L. Morino, Comment, *Tobin v. Norwood Country Club, Inc.: The Massachusetts Emergence of Dram Shop Liability for Intoxicated Minors Without Evidence of a Direct Sale to the Minor,* 33 *New Eng. L.Rev.* 173, 173 n. 3 (1998) (citation omitted). Today, the

injury or property damage resulting from the negligent service of alcoholic beverages by a licensed alcoholic beverage server," *N.J.S.A.* 2A:22A–4 (emphasis added). Under the Dram Shop Act, "a licensed alcoholic beverage server" can be held liable for damages suffered by "[a] person who sustains personal injury or property damage as a result of the negligent service of alcoholic beverages ... only if" three elements are established:

(1) *The server is deemed negligent* ...; and

(2) The injury or damage was proximately caused by the negligent service of alcoholic beverages; and

(3) The injury or damage was a foreseeable consequence of the negligent service of alcoholic beverages.

[*N.J.S.A.* 2A:22A–5(a) (emphasis added).]

Under the Act, a licensed alcoholic beverage server is "negligent *only* when the server *served a visibly intoxicated person,* or served a minor...." *N.J.S.A.* 2A:22A–5(b) (emphasis added).

There is no question that the Happy Hour Social and Athletic Club was a licensed alcoholic beverage server for purposes of the Dram Shop Act because it was issued a social affair permit to sell alcoholic beverages by the New Jersey Division of Alcohol Beverage Control pursuant to *N.J.S.A.* 33:1–74. *See N.J.S.A.* 2A:22A–3 (" 'Licensed alcoholic beverage server' or 'server' means a person ... who has been issued a permit to sell alcoholic beverages by the Division of Alcoholic Beverage Control in the Department of Law and Public Safety."). Therefore, the dictates of the Dram Shop Act apply to this case.

As noted earlier, the Club does not deny that the self-service of alcohol at the party constituted service of alcohol under the Act. That is, the Club does not read the statute to require that an alcoholic drink must be served by a bartender, waitress, or other such person before liability can attach under the statute.

---

term refers to "an establishment in which liquor is served to be consumed on the premises." *Ibid.* (citing *Black's Law Dictionary* 494 (6th ed.1990)).

■ In this case, the trial court correctly instructed the jurors that if "the Happy Hour Social & Athletic Club of Maple Shade *allowed* Mr. Kinnerman to consume alcoholic beverages when he was visibly intoxicated, then you must find the [Club] was negligent." The Legislature did not intend that a licensed alcoholic beverage server would benefit from willful blindness by hosting a party that permits the self-service of alcohol. For purposes of *N.J.S.A.* 2A:22A–5(b), a licensed alcoholic beverage server that places at the disposal of its patrons a "beer truck" for the self-service of alcohol is serving alcohol within the intendment of the statute. *See Dower v. Gamba,* 276 *N.J.Super.* 319, 326, 647 *A.*2d 1364 (App.Div.1994), *certif. denied,* 140 *N.J.* 276, 658 *A.*2d 299 (1995) ("[W]e have no doubt that a commercial server who provides alcohol to a customer by a means other than direct service may nonetheless be liable under *N.J.S.A.* 2A:22A–5b, notwithstanding the use of the term 'serve' in the statute."). Thus, if a licensed alcoholic beverage server serves alcohol in this manner to a visibly-intoxicated person, it is acting negligently and is exposed to civil liability.

Allowing the service of alcohol to a "visibly intoxicated person"—who causes personal injury or property damage that is a proximate and foreseeable consequence of his intoxication—will expose a licensed alcoholic beverage server to civil liability under *N.J.S.A.* 2A:22A–5(b). A licensed alcoholic beverage server without adequate insurance can suffer economic ruin from a lawsuit or lose its ability to secure insurance in the future. For that reason, even if not motivated by any benevolent purpose, a licensed alcoholic beverage server has a strong economic incentive to monitor the condition of persons served alcohol.

■ Plaintiff's case boiled down to one essential but disputed fact—whether Kinnerman was allowed to serve himself alcohol while visibly intoxicated. Had anyone observed Kinnerman visibly intoxicated before he walked off the Club's grounds, the jury would have been free to infer that the Club allowed Kinnerman to drink himself into a state of intoxication. No one who observed

Kinnerman during the picnic was of the opinion that he met the definition of visibly intoxicated. *See N.J.S.A.* 2A:22A–3 (" 'Visibly intoxicated' means a state of intoxication accompanied by a perceptible act or series of acts which present clear signs of intoxication."). Moreover, three men, including a Prosecutor's investigator, who presumably were in a position to discern Kinnerman's condition, chose to be passengers in Kinnerman's Ford Mustang before the deadly ride. Even Dr. Pandina, the toxicologist who testified for plaintiff, could not state with certitude—only to a reasonable degree of probability—that Kinnerman exhibited signs of intoxication at the picnic. Although Dr. Pandina relied on statistical evidence that *most* people with Kinnerman's 0.181 BAC reading will show symptoms of intoxication, he also indicated that not all people will reveal such symptoms. It was the jury's task to decide what weight, if any, to give to the testimony of the witnesses at the Pig Roast and the expert testimony. Had there been no testimony concerning Kinnerman's condition at the picnic, the jury might well have been persuaded that Dr. Pandina's testimony was sufficient to prove the Club's negligence. Ultimately, the jury determined that the Club did not negligently provide alcoholic beverages to Kinnerman when he was visibly intoxicated.

We conclude that there was sufficient credible evidence in the record to support the jury's verdict in favor of the Club. We now address the dissent in the Appellate Division.

### B.

The dissenting judge on the appellate panel concluded that the Dram Shop Act contained an "evident gap" in cases involving the self-service of alcohol—a gap that could be filled by imposing on licensed alcoholic beverage servers a duty to monitor. He believed that imposing a duty to monitor is "entirely consistent with" the Act's objectives, regardless of the absence of statutory language setting forth such a duty. The dissenting judge would construe the Dram Shop Act, even if it meant enlarging it, to meet the "evident sense of the lawgiver." (Quoting *Wright v. Vogt,* 7

*N.J.* 1, 6, 80 *A.*2d 108 (1951)). In his opinion, the trial court should have instructed the jury that the Club had "a 'responsibility to monitor alcoholic consumption,' " and that if it failed to do so the jury "was free to infer that Kinnerman's intoxication could have been observed if the alcohol consumption had been properly monitored."

The type of judicial tinkering with the statute proposed by the dissenting judge is *not* consonant with the language used in the Dram Shop Act or the legislative intent underlying the Act. The Legislature clearly signaled that the Dram Shop Act is "the exclusive civil remedy ... [for] the negligent service of alcoholic beverages by a licensed alcoholic beverage server." *N.J.S.A.* 2A:22A–4. That language strongly suggests that the Legislature did not want our courts adding civil remedies, through either the common law or creative statutory construction, not found in the Act itself. *See Verni v. Harry M. Stevens, Inc.,* 387 *N.J.Super.* 160, 187, 903 *A.*2d 475 (App.Div.), *certif. denied,* 189 *N.J.* 429, 915 *A.*2d 1052 (2007) ("Common law claims arising out of the negligent service of alcoholic beverages are thus barred by the exclusivity provisions of the Beverage Server Act." (citation omitted)). Indeed, in *Fisch v. Bellshot,* 135 *N.J.* 374, 640 *A.*2d 801 (1994), we held that "the Legislature drafted subsection b [of *N.J.S.A.* 2A:22A–5] precisely to render service to a visibly-intoxicated person the only defining act of negligence other than serving alcohol to a person whom one knows or reasonably should know under the circumstances is a minor." *Id.* at 383, 640 *A.*2d 801. We noted that in light of *N.J.S.A.* 2A:22A–5(b)'s specific language circumscribing liability, "[n]egligence is not definable by reference to administrative regulations." *Ibid.*

Significantly, the Dram Shop Act was passed at a time when licensed alcoholic beverage servers were facing a liability insurance crisis. *See N.J.S.A.* 2A:22A–2. The statute was carefully crafted to balance both the needs of licensed alcoholic beverage servers to secure affordable insurance and the rights of victims to recover for the negligent service of alcohol. *See ibid.* The

Legislature expressed its purpose in very clear terms by stating that

> lack of insurance adversely affects not only the licensed alcoholic beverage servers themselves, but also patrons and third persons who suffer personal injury and property damage as a result of the negligent service of alcoholic beverages by a licensed alcoholic beverage server.
>
> In order to make it economically feasible for insurance companies to provide coverage, the incidence of liability should be more predictable. That predictability may be achieved by defining the limits of the civil liability of licensed alcoholic beverage servers in order to encourage the development and implementation of risk reduction techniques.
>
> This act has been designed to protect the rights of persons who. suffer loss as a result of the negligent service of alcoholic beverages by a licensed alcoholic beverage server while at the same time providing a balanced and reasonable procedure for allocating responsibility for such losses. It is anticipated that this act may result in the improvement of the alcoholic beverage liability insurance market in this State.
>
> [*N.J.S.A.* 2A:22A–2.]

██ We cannot, and should not, "rewrite a plainly-written enactment of the Legislature" or "write in an additional qualification which the Legislature pointedly omitted." *DiProspero v. Penn,* 183 *N.J.* 477, 492, 874 *A.*2d 1039 (2005) (citations and internal quotation marks omitted). "Our duty is to construe and apply the statute as enacted." *Ibid.* (citation and internal quotation marks omitted). We have previously stated that "[t]here is a fine line between interpreting statutory language and engrafting a judicial standard over that language." *Serrano v. Serrano,* 183 *N.J.* 508, 518, 874 *A.*2d 1058 (2005). We believe that the dissenting judge's approach would "create[ ] a judicial standard not intended by those who wrote and enacted the statute." *Ibid.*

██ As we already have discussed, the Dram Shop Act permits a finding of liability when an establishment, such as the Happy Hour Social and Athletic Club, allows a patron to become visibly intoxicated through the self-service of alcohol at a party. For that reason alone, under the Act, a licensed alcoholic beverage server has a compelling economic interest to monitor the intake of alcohol. The Club did not benefit from the absence of monitors; rather it unnecessarily exposed itself to a potentially staggering

liability award.  However, the Dram Shop Act does not impose a separate duty to monitor alcohol ingestion or define negligence, the only available cause of action in the Act, as the failure to monitor.  Rather, a licensed alcoholic beverage server is negligent "only when the server served a visibly intoxicated person" or serves a minor.  *N.J.S.A.* 2A:22A–5(b).[8]

Needless to say, the Legislature is free to enact higher standards—such as a duty to monitor—than those presently found in our statutes, based on the reasoning of the dissenting judge.

## IV.

Accordingly, we affirm the judgment of the Appellate Division.

*For affirmance*—Chief Justice RABNER and Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO and HOENS—7.

*Opposed*—None.

---

[8] We note that the holder of a social affair permit is subject to the provisions of the Alcoholic Beverage Law, *N.J.S.A.* 33:1–1 to –97, and the regulations promulgated under that Act.  *See, e.g., N.J.S.A.* 33:1–12.37 ("Any person violating any provision of this act or of any rule or regulation issued pursuant to this act shall be punished by a fine of not less than $50.00 and not more than $250.00 and such person shall also be subject to the penalties and provisions of chapter 1 of Title 33 which are applicable thereto by virtue of such violation."); *N.J.A.C.* 13:2–5.1(g) ("A social affair permittee must abide by all the provisions of the New Jersey Alcoholic Beverage law, Division rules and regulations, and municipal ordinances.  Failure to do so may result in said permittee being denied future applications for social affair permits.").