**NOT FOR PUBLICATION WITHOUT THE**
**APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. <u>R.</u> 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2010-21

JOSE SANTIAGO,

    Plaintiff-Appellant,

v.

OSCAR MORAN,
YOLANDA S. MORAN,
RUMBA CUBANA, and
AL 1 PROPERTIES, INC.,

    Defendants-Respondents,

and

GEICO INSURANCE CO.,

    Defendant.

_____

        Submitted February 1, 2023 – Decided January 3, 2024

        Before Judges Vernoia and Firko.

        On appeal from the Superior Court of New Jersey, Law
        Division, Hudson County, Docket No. L-2845-19.

Dario, Albert, Metz, Eyerman, Canda, Concannon, Ortiz & Krouse, attorneys for appellant (Patrick M. Metz, on the brief).

BBC Law, LLP, attorneys for respondents Rumba Cubana and AL 1 Properties, Inc. (Laurence Ivan Gross, on the brief).

The opinion of the court was delivered by

VERNOIA, J.A.D.

Plaintiff Jose Santiago appeals from an order granting summary judgment to defendant Rumba Cubana, and its alleged owner, defendant AL 1 Properties, Inc. (collectively "defendants"), on his claims defendants negligently served alcohol to Oscar Moran (Moran), who operated a vehicle while intoxicated that struck and injured plaintiff as he walked on a sidewalk in Hoboken.[1]  Having conducted a de novo review of the summary judgment record, we agree with the motion court that plaintiff lacks sufficient evidence establishing defendants'

---

[1] Plaintiff's notice of appeal also states that he appeals from an order denying his motion for reconsideration of the summary judgment award.  In his brief on appeal, plaintiff does not argue the court erred by denying the reconsideration motion.  We therefore deem abandoned plaintiff's appeal from the order denying that motion.  See Drinker Biddle & Reath LLP v. N.J. Dep't. of L. & Pub. Safety, 421 N.J. Super. 489, 496 n.5 (App. Div. 2011) (explaining an issue not briefed on appeal is deemed abandoned); 539 Absecon Blvd., LLC. v. Shan Enters. Ltd. P'ship, 406 N.J. Super. 242, 272 n. 10 (App. Div. 2009) (same); Pressler & Verniero, Current N.J. Court Rules, cmt. 5 on R. 2:6-2 (2024) (noting "an issue not briefed is deemed waived").

alleged liability under the New Jersey Licensed Alcoholic Beverage Server Fair Liability Act (Dram Shop Act), N.J.S.A. 2A:22A-1 to -7, and affirm.

Because we review an order granting summary judgment de novo applying the same standard as the motion judge, we summarize the facts in the light most favorable to plaintiff as the non-moving party. See Ben Elazar v. Macrietta Cleaners, Inc., 230 N.J. 123, 135 (2017).

While walking on a Hoboken sidewalk at approximately 3:05 p.m. on April 16, 2019, plaintiff was struck and injured by a vehicle driven by Moran. Prior to the accident, Moran had eaten lunch at a North Bergen restaurant, defendant Rumba Cubana. Moran testified he arrived at the restaurant at noon.

Moran reported he was at Rumba Cubana for approximately "an hour to an hour[-]and[-]a[-]half" and left between 1:00 to 1:30 p.m. Moran testified he ate lunch with a friend and had two glasses of sangria. He denied drinking any other alcoholic beverages that day. According to Moran, when he left the restaurant, he drove to Hoboken to drop off lunch for his daughter.

Moran testified it took about forty-five minutes to drive from the restaurant to Hoboken, but he could not recall if he had stopped at any other places during the trip. When questioned at his deposition about what he did after he left Rumba Cubana and prior to the accident, Moran said he did not

recall because the accident occurred more than a year earlier, he did not "know exactly what happened," and he may have left the restaurant "a little later" than he had otherwise said. Moran also testified he remembered leaving the restaurant but did not remember anything else until the police took him out of his car after it struck plaintiff.

Following the accident, Moran was arrested and required to perform field sobriety tests. The police reports state that during a walk-and-turn test, Moran "walked in a normal fashion, feet side-by-side," but "had to be told to turn and walk back." The reports also state that during a one-legged-stand test, Moran "wobbled on his feet when he attempted to raise his right foot," and the police ended the test after two additional attempts because Moran was "in danger of falling." The reports do not include any indication that Moran's eyes were bloodshot, glassy, or watery, or that he exhibited any incoherent, rambling, boisterous, or slurred speech. The reports cited the results of chemical breath tests and a blood test showing Moran's blood alcohol content (BAC) at different times following the accident.

Plaintiff filed a complaint against Moran and defendants asserting causes for negligence and under the Dram Shop Act. Following completion of discovery, defendants moved for summary judgment, arguing plaintiff failed to

A-2010-21

produce evidence establishing defendants were liable under the Dram Shop Act by serving Moran with alcohol while he exhibited visible signs of intoxication. In their Rule 4:4-6-2(a) statement of material facts supporting the motion, defendants asserted the record lacked any factual support for plaintiff's claim they violated the Dram Shop Act. Defendants further asserted that although the September 21, 2021 discovery end date had passed, plaintiff had failed to produce any expert reports expressing "opinions regarding . . . Moran's level of intoxication or signs of visible intoxication while" at Rumba Cubana.

In response to defendants' assertion of those facts, plaintiff offered reasons for his delay in timely providing an expert's report, and he referred to and relied on a December 12, 2021 report from Robert J. Pandina, Ph.D. as support for his claim defendants are liable under the Dram Shop Act. In his report, Dr. Pandina explained he had been requested to opine "as to whether observable signs of intoxication would have been apparent" while defendant was at lunch at the restaurant such "that the staff at Rumba Cubana . . . knew or should have known [Moran] was impaired because of alcohol ingested and served him alcoholic beverages after the emergence of visible signs of intoxication."

Dr. Pandina also explained he had been requested to provide opinions as to: Moran's level of intoxication and BAC at the time of the accident; the effect

of his level of intoxication at the time of the accident on his judgment, attention, reaction time, and motor coordination; the degree to which Moran's intoxication interfered with his ability to operate his vehicle; and whether Moran's intoxication contributed to the crash. The report included an analysis of those issues, including Dr. Pandina's extrapolation of Moran's BAC—0.13 percent—at the time of the collision, and explained that level of intoxication adversely affected Moran's ability to drive safely and contributed to the causation of the accident resulting in plaintiff's injuries.

More particularly, Dr. Pandina explained that:

> Moran submitted to breath testing at the police station at 4:38 p.m. and 4:42 p.m. approximately [ninety] minutes post[-]collision. Results of the testing indicated that . . . Moran's [BAC] at those times were [0.106 percent and 0.113 percent]. Subsequent to breath testing, . . . [b]lood was collected at 5:17 p.m. (approximately [forty] minutes after breath testing was conducted). The results of toxicological analysis of . . . Moran's blood indicated a BAC of [0.10 percent].

Based on that information and other records he reviewed, Dr. Pandina opined that Moran achieved a peak BAC of 0.14 percent about forty-five minutes after he finished his last drink at Rumba Cubana. Relying on Moran's testimony he consumed his last drink at around the time he left the restaurant— between 1:00 and 1:30 p.m.—Dr. Pandina found Moran's peak BAC of 0.14

6

percent would have been reached at around 2:15 p.m.—forty-five minutes before the accident—and "would have been descending at the time of the collision." According to Dr. Pandina, at the time of the collision around 3:05 p.m., Moran's BAC was "0.13 percent (+/- 0.01 percent)."

Dr. Pandina further noted "[t]he majority of adult drinkers will display one or more visible signs of intoxication as blood alcohol concentrations rise to, reach, and exceed 0.15 percent." He also explained that only "a small percentage of individuals exhibit visible [signs of intoxication] at lower BAC levels." He provided a list of what he described were "common indicia" or "visible signs" of intoxication but did not cite to any evidence Moran exhibited any of those signs while having lunch at Rumba Cubana.

Although, as noted, Dr. Pandina's report states he had been requested to opine as to whether Moran would have exhibited observable signs of intoxication while at the restaurant—such that its staff knew or should have known Moran was intoxicated but then served Moran alcohol—the requested opinion is not included in the report and the report otherwise does not include any opinion Moran would have exhibited visible signs of intoxication while at the restaurant.

7

Dr. Pandina noted that a BAC of 0.13 percent indicates acute intoxication, which results in debilitating impairments in perceptual-motor coordination, cognitive processing, decision-making, and emotional appreciation. Dr. Pandina also observed that Moran reported significant memory loss concerning the period after he left the restaurant and before the accident occurred.

The report states that memory loss is "typically associated with a BAC in excess of 0.15 [percent] indicat[ing] a debilitating impact of intoxication beyond that typically associated with a 0.13 [percent] (+/- .01 [percent])" BAC. Dr. Pandina further opined that "[s]uch memory losses are consistent with alcohol induced blackouts that are associated with heightened levels of alcohol intoxication." The report states that for Moran to have a 0.13 percent BAC after drinking during the one-and-a-half hours he reportedly ate lunch at the Rumba Cubana, "he would have [to have been] served and consume[d] approximately [eight] to [nine] ounces of brandy" containing a forty percent alcohol content.

The report does not include an opinion as to whether it is more likely than not that Moran would have exhibited visible signs of intoxication after consuming that amount of alcohol while at Rumba Cubana. The report also does not include an opinion about, or an estimate of, Moran's BAC while he was at the restaurant. The report further lacks any analysis or conclusions concerning

8

the manner in which Moran's consumption of the alcohol or putative intoxication resulting in the memory loss may have manifested itself in visible signs of intoxication while at Rumba Cubana such that it could be reasonably and rationally inferred that defendants' staff served Moran with alcohol after he exhibited such signs. Dr. Pandina's report does not offer an opinion as to what Moran's estimated BAC would have been while at the restaurant if he had consumed that amount of alcohol or state that Moran would have exhibited visible signs of intoxication while he was there.

Following argument on the motion, the court rendered a decision from the bench granting defendants' motion. The court accepted Dr. Pandina's report but found it did not establish Moran had displayed visible signs of intoxication while at Rumba Cubana. The court found nothing in Dr. Pandina's report "that would have translated into" evidence Moran exhibited visible signs of intoxication while at Rumba Cubana and noted plaintiff's counsel's candid admission during oral argument on the motion that plaintiff "can't prove" Moran exhibited such signs.

Instead, counsel argued only that it was plaintiff's position Moran was "clearly and visibly intoxicated when he left" Rumba Cubana because he did not drink anywhere else after he left the restaurant and before the accident occurred.

A-2010-21

The court concluded the record lacked sufficient evidence permitting a rational jury to find Moran exhibited visible signs of intoxication as he ate lunch at Rumba Cubana such that plaintiff could sustain his burden under the Dram Shop Act.

Following entry of an order granting defendants' summary judgment, plaintiff moved for reconsideration. A different judge heard and denied the motion, finding plaintiff failed to satisfy the standard for reconsideration and concluding, after reviewing the summary judgment motion record, that "[t]here is zero evidence, including any expert report, . . . Moran was served alcohol while visibly intoxicated." This appeal followed.

We review a grant of summary judgment de novo, applying the same standard as the trial court. Conforti v. Cnty. of Ocean, 255 N.J. 142, 162 (2023); Samolyk v. Berthe, 251 N.J. 73, 78 (2022). The standard requires that we "consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party." Ibid. (quoting Statewide Ins. Fund v. Star Ins. Co., 253 N.J. 119, 125 (2023)). We also must determine "whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if

any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (quoting R. 4:46-2(c)). Stated differently, we consider "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Liberty Surplus Ins. Corp. v. Nowell Amoroso, P.A., 189 N.J. 436, 445-46 (2007) (quoting Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536 (1995)).

Plaintiff's claims against defendants are limited to those permitted under the Dram Shop Act. The statute provides "the exclusive civil remedy for personal injury or property damage resulting from the negligent service of alcoholic beverages by a licensed alcoholic beverage server." N.J.S.A. 2A:22A-4.

Pertinent here, the Act states:

> a. A person who sustains personal injury or property damage as a result of the negligent service of alcoholic beverages by a licensed alcoholic beverage server may recover damages from a licensed alcoholic beverage server only if:
>
> (1) The server is deemed negligent pursuant to subsection b. of this section; and

(2) The injury or damage was proximately caused by the negligent service of alcoholic beverages; and

(3) The injury or damage was a foreseeable consequence of the negligent service of alcoholic beverages.

b. A licensed alcoholic beverage server shall be deemed to have been negligent only when the server served a visibly intoxicated person, or served a minor, under circumstances where the server knew, or reasonably should have known, that the person served was a minor.

[N.J.S.A. 2A:22A-5.]

Thus, under the Dram Shop Act, "[a]llowing the service of alcohol to a 'visibly intoxicated person'—who causes personal injury or property damage that is a proximate and foreseeable consequence of his intoxication—will expose a licensed alcoholic beverage server to civil liability under N.J.S.A. 2A:22A-5(b)." Mazzacano v. Est. of Kinnerman, 197 N.J. 307, 320 (2009).

Visible intoxication is defined as "a state of intoxication accompanied by a perceptible act or series of acts which present clear signs of intoxication." N.J.S.A. 2A:22A-3. To establish a cause of action under the Dram Shop Act, a plaintiff must therefore prove both a tortfeasor was intoxicated and exhibited perceptible acts presenting clear signs of intoxication. Ibid. Moreover, a plaintiff must prove the defendant served alcohol to the tortfeasor after the tortfeasor was visibly intoxicated. N.J.S.A. 2A:22A-5(b); see also Bauer v.

12

Nesbitt, 198 N.J. 601, 613 (2009) (explaining that under the Dram Shop Act, "a licensed alcoholic beverage server is 'negligent "only when the server served a visibly intoxicated person" or serves a minor'") (quoting Mazzacano, 197 N.J. at 324).

A plaintiff asserting a cause of action under the Act is not required to present eyewitness testimony or other direct evidence that a server served alcohol to a visibly intoxicated person. Halvorsen v. Villamil, 429 N.J. Super. 568, 575 (App. Div. 2013). However, "[t]o defeat a motion for summary judgment in a" case brought under the Dram Shop Act, "a plaintiff must present sufficient direct or circumstantial evidence that would permit a jury to reasonably and legitimately deduce that a beverage server served alcoholic beverages to the person at issue while he or she was visibly intoxicated." Ibid. (citing Salemke v. Sarvetnick, 352 N.J. Super. 319, 327 (App. Div. 2002)).

Based on our review of the summary judgment record, we are persuaded the motion court correctly determined plaintiff failed to present sufficient evidence permitting a rational juror to conclude Moran was served alcoholic beverages after exhibiting visible signs of intoxication. Conforti, 255 N.J. at 162. It is undisputed there is no direct evidence Moran exhibited visible signs

of intoxication while at the restaurant or that defendants' staff served him alcohol after he exhibited such signs.

Instead, plaintiff relies solely on Dr. Pandina's report to establish there is circumstantial evidence defendants' staff served alcohol to Moran after he showed visible signs of intoxication. In <u>Mazzacano</u>, the Court found an expert's report offering an opinion "within a reasonable degree of probability" that the tortfeasor "'was visibly intoxicated'" and "exhibited signs of intoxication" at a party hosted by the defendant "was sufficient to" to establish the defendants' negligence under the Dram Shop Act. 197 N.J. at 313, 321. There is no similar evidence here.

Unlike the report considered by the Court in <u>Mazzacano</u>, and despite the fact Dr. Pandina was expressly requested to do so, his report does not include an opinion within a reasonable degree of probability or otherwise that Moran was visibly intoxicated while at Rumba Cubana. Dr. Pandina's report does not offer an opinion concerning whether Moran exhibited, or likely would have exhibited, visible signs of intoxication while at the restaurant such that a rational juror could conclude defendants' staff served him alcohol after he exhibited physical signs of intoxication. Thus, as the motion court aptly recognized, the report does not provide sufficient evidence satisfying plaintiff's burden under

14

the Dram Shop Act, see Mazzacano, 197 N.J. at 324, and plaintiff offers no other evidence supporting his claim under the statute.

We recognize the report includes estimates of Moran's BAC levels at various times following his departure from the restaurant. Dr. Pandina extrapolated those levels based on the results of chemical breath tests and a blood test following the accident. Dr. Pandina's report explained his findings and opinions were based on the science underlying the extrapolation of BAC levels and that "[b]y understanding alcohol concentrations at certain times, experts can estimate potential levels of impairment in various functions at those points in time."

Dr. Pandina's report does not include an extrapolation of Moran's BAC at any point in time Moran ate lunch at Rumba Cubana. Thus, the scientifically based methodology Dr. Pandina described that he used to form his opinions—which he claimed permits an assessment of levels of impairment at particular points in time based on the BAC levels at those points in time—was not employed to offer an opinion concerning Moran's level of impairment, if any, while at defendants' restaurant. That is, Dr. Pandina did not calculate Moran's alcohol concentration at the only relevant point in time—while he ate lunch at Rumba Cubana. The report therefore is bereft of any opinion based on the only

15

methodology Dr. Pandina explained could be used to establish levels of impairment establishing Moran's level of impairment at the restaurant such that a rational juror could conclude defendants served Moran alcohol after he exhibited visible signs of intoxication. And, as noted, the report lacks any opinion that Moran's consumption of alcohol caused visible signs of intoxication such that a rational jury could infer he exhibited such signs while at the restaurant.

Dr. Pandina noted Moran reported he had no recall about what occurred after he left Rumba Cubana and until the police took him from his car following the accident. Dr. Pandina opined that "[s]uch memory losses are consistent with alcohol induced blackouts that are associated with heightened levels of alcohol intoxication," and "[h]ence, it is probable that . . . Moran was impacted by alcohol induced intoxication in a manner typically associated with" BACs "higher" than the 0.14 percent BAC that Dr. Pandina calculated was Moran's "peak" BAC at 2:15 p.m.; approximately an hour after he left the restaurant and fifty minutes before the accident.[2] Dr. Pandina's report, however, does not

---

[2] Dr. Pandina's report includes conflicting statements concerning Moran's peak BAC following his lunch at Rumba Cubana. The report states Moran's peak BAC was 0.14 percent at 2:15 p.m. and descended to 0.13 percent when the collision occurred at 3:05 p.m. The report thereafter states Moran's peak BAC

16

explain whether Moran's later lack of recall of the events occurring after his departure from the restaurant support an inference Moran exhibited visible signs of intoxication while eating lunch at Rumba Cubana. Similarly, the report states it is probable Moran consumed eight to nine ounces of brandy while at Rumba Cubana, but does include an opinion as to whether consumption of that amount of alcohol would have resulted in Moran's exhibition of visible signs of intoxication while at the restaurant.

Plaintiff relied exclusively on Dr. Pandina's report to establish an essential element of his claim—that defendants violated the Dram Shop Act by serving Moran with alcohol after he exhibited visible signs of intoxication. Plaintiff's reliance is misplaced because the report offers no opinion as to Moran's purported level of intoxication while at the restaurant or whether his level of intoxication permits a finding that he had exhibited visible signs of intoxication such that a rational jury could conclude defendants violated the statute. We

___

was 0.13 percent at the time of the collision. We attribute the latter references to misstatements or typographical errors and accept the report's initial statement of Moran's peak BAC of 0.14 percent as what Dr. Pandina intended. In any event, because Dr. Pandina did not offer opinions on Moran's level of intoxication while at the restaurant or that Moran's his level of intoxication while at the restaurant would have likely resulted in the exhibition of visible signs of intoxication, the different statements concerning Moran's BAC an hour or so after he left the restaurant are of no moment under the Dram Shop Act.

A-2010-21

therefore affirm the court's orders granting defendants summary judgment and denying defendants' reconsideration motion.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2010-21