20 A.3d 384

JOSEPH A. DONELSON, PLAINTIFF, AND JOHN SEDDON, PLAIN-
TIFF–APPELLANT, v. DUPONT CHAMBERS WORKS, DEFEN-
DANT–RESPONDENT, AND PAUL KAISER, DEFENDANT.

Argued December 1, 2010—Decided June 9, 2011.

244

*Nancy Erika Smith* argued the cause for appellant (*Smith Mullin,* attorneys; *Ms. Smith* and *Neil M. Mullin,* of counsel and on the briefs).

*David S. Fryman* argued the cause for respondent (*Ballard Spahr,* attorneys; Mr. *Fryman* and *Jennifer L. Sova,* on the briefs).

*Christopher H. Mills* submitted a brief on behalf of amicus curiae Academy of New Jersey Management (*Fisher & Phillips,* attorneys; *Mr. Mills* and *David J. Treibman,* on the brief).

*Ty Hyderally,* President, submitted a brief on behalf of amicus curiae National Employment Lawyers Association/New Jersey (*Hyderally & Associates,* attorneys; *Mr. Hyderally* and *Francine R. Foner,* on the brief).

Justice ALBIN delivered the opinion of the Court.

A jury determined that DuPont Chambers Works [1] (DuPont) violated the Conscientious Employee Protection Act (also referred to as CEPA), *N.J.S.A.* 34:19–1 to –8, by retaliating against one of its employees, plaintiff John Seddon, for reporting safety concerns about the company's operation. The retaliatory acts caused Seddon to suffer, in effect, a mental breakdown rendering him unfit for continued employment at DuPont. The jury found that Seddon's lost wages were the proximate result of DuPont's retaliation and awarded him both economic and punitive damages.

The Appellate Division overturned the verdict and damages award, reasoning that the trial judge erred by not instructing the jury that Seddon could be awarded lost wages only if he was constructively discharged. According to the Appellate Division, Seddon was not entitled to lost wages unless "[t]he employer's conduct [was] 'so intolerable that a reasonable person would be forced to resign rather than continue to endure it.'" *Donelson v. DuPont Chambers Works,* 412 *N.J.Super.* 17, 31, 988 *A.*2d 604 (App.Div.2010) (citation and quotation omitted).

We now reverse the Appellate Division. Constructive discharge is but one ground for recovery of lost wages under CEPA. CEPA does not permit an employer to take an "adverse employment action" against an employee for reporting workplace-safety violations. *N.J.S.A.* 34:19–2(e), –3. If an employer engages in unlawful retaliation, then it is accountable for the damages proximately

[1] The company's correct legal name is E.I. du Pont de Nemours and Company.

caused to the employee. Here, the trial judge properly instructed the jury on both the elements of a CEPA claim and the common-law principles of damages that apply to such a claim. Seddon introduced medical testimony that the reprisals against him for his whistle-blowing activities mentally disabled him from continued employment at DuPont. That was a sufficient basis for the award of lost wages. Seddon was not required to show that a "reasonable person"—one not psychologically injured—would have left DuPont because of the intolerable conditions of his employment.

We therefore reinstate the jury's verdict and award of damages.

## I.

Defendant DuPont, which manufactures chemical products, employed plaintiff John Seddon for approximately thirty years.[2] In December 2002, Seddon was an operator technician in the phosgene building at one of DuPont's facilities. Phosgene is a "highly toxic" and "very reactive chemical." [3] Among Seddon's duties was to ensure the safe operation of equipment and the safe handling of dangerous chemicals in the building. He was also responsible for the safety of those who worked there and those who lived in the surrounding area.

In December 2002, Seddon expressed to a shift manager his concern about the dangerous manner in which DuPont's security guards were conducting random searches of employees' cars at nighttime. Drivers were made to exit from their cars at the front gate and stand unprotected in the dark while passing traffic,

---

[2] Because the jury rendered a verdict in favor of plaintiff, we view the facts in the light most favorable to him. *See Besler v. Bd. of Educ. of W. Windsor–Plainsboro Reg'l Sch. Dist.,* 201 *N.J.* 544, 556, 993 *A.*2d 805 (2010) (citation omitted); *see also Smith v. Cruse,* 101 *N.J.L.* 82, 83, 128 *A.* 379 (E. & A.1925) ("A judgment presupposes a finding of facts in favor of the successful party...").

[3] DuPont manufactures phosgene for use in the production of Kevlar (a "bulletproof vest fiber") and Nomex (a "fire-retardant fiber").

including trucks, whizzed by.[4] Because DuPont did nothing to ameliorate the safety hazards caused by these stops, Seddon filed a complaint with the federal Occupational Safety and Health Administration (OSHA).

After DuPont became aware of the OSHA complaint, it appointed Paul Kaiser to serve as Seddon's direct shift supervisor. Kaiser began imposing sick- and vacation-day-reporting requirements specific to Seddon, who previously did not report to a shift supervisor.

In October 2003, Seddon filed complaints with DuPont's management about unsafe conditions in the operation of the phosgene reactor. Seddon warned that deficiencies in the operation of the reactor could cause an explosion and the release of deadly gasses into the atmosphere, killing and seriously injuring nearby residents. Seddon compared the safety violations relating to the phosgene reactor to those that led to the infamous chemical disaster in Bhopal, India.[5] In response, the DuPont Guardian Manual, to which Seddon referred in detailing safety violations, was removed from the phosgene control area where Seddon worked.

A few months later, according to Seddon, Kaiser falsely accused him of forging his timecards. Seddon also stated that, in March 2004, DuPont's management falsely accused him of failing to take a proper reading of a caustic chemical and of making a fictitious entry in a log. There followed a negative performance review of Seddon and the institution of performance reviews every three months. During this time period, Kaiser subjected Seddon to constant verbal abuse. Seddon reported to DuPont's corporate

---

[4] Specifically, Seddon cited a lack of lighting, an absence of a safe place for employees to pull over during the stops, and the absence of lines designating appropriate stop areas.

[5] In 1984, a "leak at the Union Carbide chemical plant in Bhopal ... killed 3,000 people and sickened thousands more." Hari Kumar, *India: Court Stands by Charges in Bhopal Leak*, N.Y. Times, May 12, 2011, at A10.

headquarters that he had become the target of harassment for merely voicing safety concerns.

Although DuPont's investigators questioned Seddon about his safety complaints and the ensuing harassment, their attention focused on allegations that Seddon had threatened DuPont employees, including Kaiser—allegations that Seddon categorically denied. In April 2004, based on a recommendation by DuPont's employee-assistance counselor, Seddon was placed on short-term disability with pay. During that time, Seddon lost the considerable overtime that he had been earning. As a condition of his reinstatement, DuPont required that Seddon be examined by three mental-health experts and undergo a fit-for-duty evaluation. Three independent evaluators, a psychiatrist and two psychologists, examined Seddon and cleared him to return to work. Significantly, one of the mental-health experts diagnosed Seddon as exhibiting "features of significant dysphoria and vulnerability to depression." [6]

The suspension, which lasted fifty-three days, made Seddon feel "worthless" and "beaten." Moreover, DuPont placed Seddon on "probation" subject to performance reviews every three months. Seddon maintained that Kaiser continued to make false accusations that Seddon had threatened him and other employees. Interactions with Kaiser caused Seddon to suffer anxiety attacks, and Seddon lived in constant fear that he would become the target of continued false charges of misconduct.

In September 2006, DuPont required Seddon to work twelve-hour shifts in isolation. For Seddon, working a twelve-hour shift alone was "torture." One month later, Seddon began seeing a therapist and psychiatrist.

In January 2007, Seddon took a six-month leave of absence. After completing that leave of absence, DuPont gave Seddon a disability pension. Seddon never returned to DuPont.

---

[6] Dysphoria is defined as "[a] mood of general dissatisfaction, restlessness, depression, and anxiety." *Stedman's Medical Dictionary* 599 (28th ed. 2006).

## II.

In February 2005, Seddon filed a civil complaint alleging that defendants DuPont and Kaiser retaliated against him for objecting to activity that he reasonably believed violated New Jersey's law and public policy.[7] Seddon asserted that the reprisals against him contravened the Conscientious Employee Protection Act, *N.J.S.A.* 34:19–1 to –8. Seddon also asserted the common-law claim of intentional/negligent infliction of emotional distress against both defendants.[8] Seddon sought compensatory damages for "loss of earnings and other employment benefits" and for suffering mental anguish, humiliation, and injury to his reputation.

Seddon's complaint was filed while he still worked for DuPont. His case did not come to trial until January 2008, after he left the company's employ with a disability pension. Seddon did not amend his complaint to allege a constructive discharge.

At the beginning of the trial in January 2008, DuPont moved to bar Seddon's economic-damages claim for front and back pay because he had not pled constructive discharge and DuPont had not terminated him.[9] The trial court denied DuPont's in limine motion.[10] The court held that if Seddon could prove that DuPont's retaliation caused him to suffer a psychological break-down that led to his acceptance of an early disability retirement,

[7] Seddon voluntarily dismissed the claims against Kaiser before trial. Joseph Donelson was also a plaintiff in this action. Seddon's and Donelson's cases were tried jointly before the same jury. The jury rejected Donelson's claims. His case is not before us.

[8] Seddon voluntarily withdrew this claim before trial.

[9] Front pay refers to future lost wages accruing after a jury's verdict, whereas back pay refers to lost wages already accrued as of that date. *See Cavuoti v. N.J. Transit Corp.*, 161 *N.J.* 107, 135, 735 A.2d 548 (1999); *Baker v. Nat'l State Bank*, 353 *N.J.Super.* 145, 158, 801 A.2d 1158 (App.Div.2002) (citations omitted).

[10] Notably, Seddon's counsel stated that he would amend the complaint to allege constructive discharge if the trial court granted DuPont's motion. Needless to say, that became unnecessary.

then he would be entitled to the difference between the wages he would have earned had he worked and retired in the ordinary course and the disability pension he was receiving.

During a several-week trial, numerous witnesses testified, including Seddon's psychological experts, who concluded that Seddon was mentally disabled as a result of DuPont's retaliatory conduct. Louise Cressman–Watral, a therapist, counseled Seddon for approximately sixteen months. She testified that Seddon was suffering from "a major depressive disorder" caused by DuPont's reprisals and general mistreatment of him. Seddon exhibited "fear of DuPont as an employer," and was suffering from "insomnia, loss of appetite," "anxiety," and feelings of "hopelessness." She further noted that the retaliation forced Seddon to take psychotropic medications to battle his depression and insomnia. Watral ultimately concluded that it was unlikely that Seddon would ever recover from the mental illness caused by DuPont.

Dr. Charles Semel, a psychiatrist, also testified, explaining that Seddon suffered from "pathological stress" that was "affecting the quality of his life." The stress was "causally related" to DuPont's retaliation against Seddon for raising safety concerns about the plant's operation. Dr. Semel reasoned that Seddon had been sensitized to safety issues after witnessing a "devastating industrial accident" at DuPont years earlier in which several of his coworkers were severely injured. In addition to his concern for others, Seddon "felt physically at risk" at the plant, and the isolation he endured at the end of his career forced him "to function alone in a fairly dangerous environment." Dr. Semel ultimately concluded that the mental illness caused by DuPont's retaliation was both "worsening" and "permanent."

The trial court charged the jury in accordance with its earlier ruling that a recovery of lost wages was not dependent on proving a constructive discharge. The court instructed the jury:

> Mr. Seddon claims that DuPont caused him to suffer economic loss by depriving him of overtime pay, and by causing him to suffer a psychiatric illness that required him to retire earlier than he wanted to on a disability pension.

In order to obtain economic damages related to his psychiatric disability, Mr. Seddon must prove that DuPont proximately caused his disability, and that his disability rendered him unable to perform work for DuPont.

The jury returned a verdict in favor of Seddon, finding that he had "proven by a preponderance of the evidence that DuPont retaliated against him in violation of New Jersey's Conscientious Employee Protection Act." The jury awarded Seddon $724,000 for the "economic losses he ha[d] suffered as a proximate result of DuPont's violations of [CEPA]" and $500,000 in punitive damages. Seddon did not receive an award for pain and suffering. Additionally, the trial court awarded Seddon $523,289 in counsel fees.

DuPont appealed.

## III.

The Appellate Division reversed and entered judgment in favor of DuPont, concluding that Seddon could not prevail on a lost-wage claim under CEPA unless he proved an actual or constructive discharge. *Donelson v. DuPont Chambers Works*, 412 *N.J.Super.* 17, 22–23, 988 *A.2d* 604 (App.Div.2010).[11] In justifying that decision, the panel compared the Law Against Discrimination (LAD), *N.J.S.A.* 10:5–1 to –49, to CEPA. *Id.* at 30–36, 988 *A.2d* 604. The panel claimed that "in the LAD context," several Appellate Division decisions concluded "that economic damages cannot be recovered where there has been no constructive discharge." *Id.* at 32, 988 *A.2d* 604 (citations omitted). The panel reasoned that because CEPA and LAD cases have been construed "identically on a wide variety of substantive issues" and because "[n]othing in the legislative history of CEPA requires a contrary

---

[11] The panel "recognize[d] that plaintiff's claim for economic damages— arising from DuPont's alleged retaliatory reduction in his opportunity to earn overtime compensation—is not affected by plaintiff's failure to prove a constructive discharge." *Donelson, supra*, 412 *N.J.Super.* at 35 n.10, 988 *A.2d* 604. Nevertheless, the panel denied Seddon a new trial to determine damages for lost overtime for several reasons. *Ibid.* The panel maintained that the issue of lost overtime was disputed, the jury verdict did not specify whether its economic-damages award included lost overtime, and Seddon did "not claim that the loss of overtime pay entitle[d] him to a new trial." *Ibid.*

result," a plaintiff in a CEPA case should be required in pursuing a lost-wage claim to prove an actual or constructive discharge. *Id.* at 33–35, 988 *A.*2d 604. Because punitive damages may be awarded only if a plaintiff receives an award of compensatory damages, the panel vacated the punitive-damages award as well. *Id.* at 36, 988 *A.*2d 604. Those rulings stripped Seddon of his status as a "prevailing party," and therefore the panel vacated the trial court's award of attorneys' fees. *Id.* at 36–37, 988 *A.*2d 604. In light of the panel's ruling that Seddon was not entitled to attorneys' fees, it did not address his claim that the fees awarded were insufficient. *Ibid.* Similarly, it did not address DuPont's alternative arguments challenging the propriety of the punitive-damages award. *Id.* at 36, 988 *A.*2d 604.

We granted Seddon's petition for certification, "limited to the issue whether recovery for economic losses associated with back and front pay requires proof of actual or constructive discharge under the Conscientious Employee Protection Act, *N.J.S.A.* 34:19–1 to –8." *See Donelson v. DuPont Chambers Works*, 203 *N.J.* 95, 999 *A.*2d 464 (2010). We also granted the motions of the New Jersey Chapter of the National Employment Lawyers Association and the Academy of New Jersey Management Attorneys to participate as amici curiae.[12]

## IV.

The question presented in this case is whether, under CEPA, an employee who becomes the victim of employer retaliation for

---

[12] After hearing oral argument, the Court requested additional briefing to address the following question:

> If proof of constructive discharge is an essential element of a CEPA claim for front and back pay, does the [*Shepherd v. Hunterdon Developmental Center*, 174 *N.J.* 1, 803 *A.*2d 611 (2002)] paradigm require modification to account for a case in which a plaintiff has been damaged, psychologically or otherwise, by his employer's retaliatory acts and, as a result, obtains a disability retirement? If so, how should it be modified?

Because ultimately we decide that constructive discharge is not an element of a CEPA claim, this question is rendered moot.

engaging in statutorily protected whistle-blowing activities and who becomes psychologically disabled due to that retaliation can pursue a lost-wage claim without having to prove a constructive discharge.

Seddon and amicus New Jersey Chapter of the National Employment Lawyers contend that the plain language and remedial purpose of CEPA support the trial court's application of common-law principles of damages to the lost-wage claim in this case. They maintain that testimony from mental-health experts that unlawful retaliation caused an employee's psychological breakdown rendering him unfit for duty is sufficient to make out a lost-wage claim. They urge this Court not to superimpose a requirement of constructive discharge—not found in the statute—as an essential element of a lost-wage claim in a CEPA case and to reinstate the jury's verdict.

On the other hand, DuPont and amicus Academy of New Jersey Management Attorneys assert that, consistent with LAD jurisprudence, proof of a constructive discharge—absent an actual discharge—should be a prerequisite to the award of lost wages. They reason that applying an objective, constructive-discharge standard to a CEPA lost-wage claim will ensure predictability in compensatory-damage awards. They believe that affirming the Appellate Division's approach will deter pretextual claims, protect against an award to the idiosyncratic plaintiff, and safeguard employers from an unwarranted expansion of liability claims.

The resolution of the issue before us is one of statutory interpretation—determining the remedies available to whistle-blowers under CEPA. Therefore, we first turn to CEPA, exploring its overarching purpose and the specific statutory language that applies to this case.

## V.

The Conscientious Employee Protection Act, *N.J.S.A.* 34:19-1 to –8, is intended to encourage employees to speak up about unsafe working conditions that violate the law or public

policy and to provide protection for those who do so. *See Barratt v. Cushman & Wakefield of N.J., Inc.*, 144 *N.J.* 120, 127, 675 *A.2d* 1094 (1996). Under CEPA, it is unlawful for an employer to retaliate against an employee who "report[s] illegal or unethical workplace activities." *Dzwonar v. McDevitt*, 177 *N.J.* 451, 461–62, 828 *A.2d* 893 (2003) (internal quotations and citation omitted). Because CEPA is "remedial legislation," it "should be construed liberally to effectuate its important social goal"—"to encourage, not thwart, legitimate employee complaints." *Id.* at 463, 828 *A.2d* 893 (internal quotation marks and citations omitted); *accord D'Annunzio v. Prudential Ins. Co. of Am.*, 192 *N.J.* 110, 120, 927 *A.2d* 113 (2007).

We begin our analysis by looking at the statute's plain language, which is generally the best indicator of the Legislature's intent. *DiProspero v. Penn*, 183 *N.J.* 477, 492, 874 *A.2d* 1039 (2005). We must ascribe to the words used in CEPA their "ordinary meaning and significance ... and read them in context with related provisions so as to give sense to the legislation as a whole." *Ibid.* (citations omitted).

CEPA prohibits an employer from taking "any *retaliatory action* against an employee" who engages in certain protected activity. *N.J.S.A.* 34:19–3 (emphasis added). Thus, an employer may not retaliate against an employee who "[d]iscloses ... to a supervisor or to a public body an activity, policy or practice of the employer ... that the employee reasonably believes ... is in violation of a law, or a rule or regulation promulgated pursuant to law." *N.J.S.A.* 34:19–3(a). Nor may an employer retaliate against an employee who "[o]bjects to ... any activity, policy or practice which the employee reasonably believes ... is in violation of a law, or a rule or regulation" or "is incompatible with a clear mandate of public policy concerning the public health, safety or welfare or protection of the environment." *N.J.S.A.* 34:19–3(c). One could hardly dispute that an employee's complaint to a supervisor or his objections raised about the catastrophic consequences that he reasonably believes might occur from the unsafe

operation of a reactor containing extremely dangerous chemicals falls within the activity protected by *N.J.S.A.* 34:19–3(a) or (c).

The issue in this case is not whether Seddon engaged in protected activity under CEPA but whether DuPont took retaliatory action against him that entitles him to lost wages. " 'Retaliatory action' " is defined as "the discharge, suspension or demotion of an employee, or *other adverse employment action* taken against an employee in the terms and conditions of employment." *N.J.S.A.* 34:19–2(e) (emphasis added). An employee who suffers "retaliatory action" may file a civil suit and, if he prevails, is entitled to "[a]ll remedies available in common law tort actions." *See N.J.S.A.* 34:19–5. The statute further provides that "[t]he court shall also order, where appropriate and to the fullest extent possible[,] ... compensation for all lost wages, benefits and other remuneration." *Ibid.*

In surveying the sweep of CEPA, we must determine what acts are " '[r]etaliatory' " under the statute, *N.J.S.A.* 34:19–2(e), and then what "remedies available in common law tort actions" are applicable here, *N.J.S.A.* 34:19–5. CEPA specifies that the "discharge" of an employee for engaging in protected activity is retaliatory action. *N.J.S.A.* 34:19–2(e). A discharge encompasses not just an actual termination from an employment, but a constructive discharge. A constructive discharge occurs when an employer's conduct "is so intolerable that a reasonable person would be forced to resign rather than continue to endure it." *Shepherd v. Hunterdon Developmental Ctr.*, 174 *N.J.* 1, 28, 803 *A.2d* 611 (2002) (citation omitted). But the universe of possible retaliatory actions under CEPA is greater than discharge, suspension, and demotion; it includes "other adverse employment action taken against an employee in the terms and conditions of employment." *N.J.S.A.* 34:19–2(e).

What constitutes an "adverse employment action" must be viewed in light of the broad remedial purpose of CEPA, and our charge to liberally construe the statute to deter workplace reprisals against an employee speaking out against a company's illicit

or unethical activities. Cast in that light, an "adverse employment action" is taken against an employee engaged in protected activity when an employer targets him for reprisals—making false accusations of misconduct, giving negative performance reviews, issuing an unwarranted suspension, and requiring pretextual mental-health evaluations—causing the employee to suffer a mental breakdown and rendering him unfit for continued employment. *See N.J.S.A.* 34:19–2(e).

If the employer's retaliatory action is the proximate cause of the employee's mental unfitness for duty, then CEPA grants the employee "[a]ll remedies available in common law tort actions." *N.J.S.A.* 34:19–5. The "[a]ll remedies available" language is complemented by the more specific provision that the "court shall also order, where appropriate and to the fullest extent possible[,] . . . compensation for all lost wages, benefits and other remuneration." *Ibid.*

 Under the common law, "a defendant who negligently injures a plaintiff or his property may be liable for all proximately caused harm, including economic losses." *People Express Airlines, Inc. v. Consol. Rail Corp.,* 100 *N.J.* 246, 251, 495 *A.*2d 107 (1985). More to the point, a person injured by the tortious conduct of another "has the right to recover damages for diminished-earning capacity," provided there is sufficient proof both to establish that the injury will impair his future income and to quantify the lost income. *Frugis v. Bracigliano,* 177 *N.J.* 250, 285, 827 *A.*2d 1040 (2003) (citations omitted); *accord Coll v. Sherry,* 29 *N.J.* 166, 176, 148 *A.*2d 481 (1959) (same). For example, a professional baseball player whose career ends because he was struck by a negligently operated car will have a lost-wage claim that likely will include, by the time of trial, a claim for back and front pay. The traditional principles of damages in tort cases apply with equal force in this case. To the extent that DuPont, by its retaliatory action, proximately caused Seddon to suffer a mental injury incapacitating him from his former employment, he

has "the right to recover damages for diminished-earning capacity." *See Frugis, supra,* 177 *N.J.* at 285, 827 *A.*2d 1040.

This plain-language approach ordinarily would be dispositive and end our analysis. However, we also reject DuPont's assertion that the legislative history of CEPA or the constructive-discharge jurisprudence under LAD suggests a contrary result. We address each of those points in turn.

## VI.

### A.

The Legislature enacted the Conscientious Employee Protection Act in 1986. *See N.J.S.A.* 34:19–1 to –8; *L.* 1986, *c.* 105. Since its creation, CEPA's overall structure has remained essentially unaltered, but the scope of its protections and the breadth of its remedies have expanded considerably.

The definition of "[r]etaliatory action" remains in its original form to the present day. *Compare L.* 1986, *c.* 105, § 2; *with N.J.S.A.* 34:19–2(e). However, the scope of protected activities has been expanded through several amendments. *Compare L.* 1986, *c.* 105, § 3; *with L.* 1989, *c.* 220; *L.* 1997, *c.* 98, § 2; *and L.* 2005, *c.* 329, § 1. Additionally, CEPA's remedy provision, *N.J.S.A.* 34:19–5, has been strengthened twice since its enactment. *See L.* 1990, *c.* 12, § 4; *L.* 2005, *c.* 329, § 2. The first iteration of CEPA in 1986 did not include the following language added in 1990: "All remedies available in common law tort actions shall be available to prevailing plaintiffs." *Compare L.* 1986, *c.* 105, § 5; *with L.* 1990, *c.* 12, § 4. Moreover, in 2005 the Legislature further expanded relief available to successful plaintiffs by amending *N.J.S.A.* 34:19–5. Before 2005, CEPA provided that a "court may also order ... compensation for lost wages, benefits and other remuneration." *L.* 1990, *c.* 12, § 4. The newly enacted provision seemingly put more teeth in the remedy, stating that a "court *shall* also order, where appropriate and to the fullest extent

possible[,] . . . compensation for *all* lost wages, benefits and other remuneration." *L.* 2005, *c.* 329, § 2 (emphasis added).

DuPont argues that a statement issued by the Senate Labor Committee, at the time of the proposed 2005 amendments, indicates that the Legislature intended an actual or constructive discharge to be a precondition for a lost-wage claim. We find no credible support for that position.

The Senate Labor Committee reported favorably on the bill proposing the 2005 amendments, noting that it "enhances the scope and strengthens the enforcement provisions of" CEPA. Senate Labor Committee, *Statement to Senate Bill No. 1886* (Oct. 14, 2004).[13] The Committee emphasized that the proposed law "is not intended to diminish, reduce or curtail the rights or remedies available to employees under [CEPA] in any way." *Ibid.* DuPont grasps on to the following language to suggest that a lost-wage claim is dependent on a constructive discharge:

> The bill states that the court must order, to the fullest extent possible, an injunction against continuing violations, reinstatement to employment, compensation for lost pay and costs of the case, but only where appropriate. The bill thus takes into consideration that not all of these measures are always applicable, as, for example, in a case where the employer retaliation did not include a termination of employment.
>
> [*Ibid.*]

This committee statement makes the unremarkable point that the remedy must be commensurate with the loss or damage suffered by the plaintiff; thus, a remedy will only follow "where appropriate." Surely, it would not be "appropriate," or necessary, to order "reinstatement to employment" for an employee who was not terminated. It would not be "appropriate" to award "compensation for all lost wages" if the employee remained employed and suffered only emotional damages. But nothing in this committee statement in any way suggests that compensation for lost wages would not be "appropriate" if an employer that repeatedly retal-

---

[13] These statements were reprinted virtually verbatim by the Assembly State Government Committee in 2006. Assembly State Government Committee, *Statement to Senate Bill No. 1886* (Jan. 5, 2006).

iates against an employee causes the employee to suffer a disabling mental illness.

The clear language of CEPA is our surest guide. We will not "rewrite a plainly-written enactment" or engraft "an additional qualification which the Legislature pointedly omitted." *See Mazzacano v. Estate of Kinnerman*, 197 *N.J.* 307, 323, 962 *A.*2d 1103 (2009) (internal quotation marks and citation omitted). The remedy provision of CEPA, *N.J.S.A.* 34:19-5, does not intimate that a constructive discharge is the only basis for a lost-wage claim in the circumstances before us.

In charging the jury, the trial court properly followed the Legislature's expressed intent that "[a]ll remedies available in common law tort actions shall be available to prevailing plaintiffs." *Ibid.* The jury's verdict reveals that DuPont retaliated against Seddon because he expressed legitimate safety concerns about the operation of the phosgene reactor, that DuPont's retaliatory action caused Seddon's mental injury, that Seddon's mental injury disabled him from working, and that his inability to work resulted in his lost wages.

## B.

DuPont also urges us to abandon our plain-language interpretation of CEPA on the supposition that an actual or constructive discharge is the only means of pursuing a lost-wage claim under LAD. That supposition is somewhat dubious because this Court has never concluded in a LAD retaliation case that front and back pay can be awarded only in cases of actual or constructive discharge. On occasion, when appropriate, we have looked to LAD in construing CEPA.[14] But CEPA and LAD are statutes

---

[14] *See, e.g., D'Annunzio, supra,* 192 *N.J.* at 123–25, 927 *A.*2d 113 (adopting LAD definition of "employee" for CEPA); *Green v. Jersey City Bd. of Educ.,* 177 *N.J.* 434, 447–48, 828 *A.*2d 883 (2003) (applying LAD's continuing-violation theory to CEPA); *Cedeno v. Montclair State Univ.,* 163 *N.J.* 473, 479, 750 *A.*2d 73 (2000) (treating public employee's failure to disclose prior conviction similarly under

that have their own distinct purposes and are worded differently to achieve those purposes. *See generally N.J.S.A.* 10:5–1 to –49; *N.J.S.A.* 34:19–1 to –8. It is enough for us to decide the case before us based on the controlling statutory language in CEPA without resolving different scenarios that might arise under LAD. Nevertheless, several points must be made in response to Du-Pont's arguments.

We reject DuPont's assertion that *Shepherd, supra,* 174 *N.J.* 1, 803 *A.*2d 611, stands for the proposition that a constructive discharge is a prerequisite to a lost-wage claim under CEPA. In *Shepherd,* Richard Saylor claimed that his employer—through harassing conduct—retaliated against him in violation of LAD, resulting in his constructive discharge. *Id.* at 7, 27, 803 *A.*2d 611. To prove a constructive discharge, Saylor had to show that his employer's conduct was "so intolerable that a reasonable person would be forced to resign rather than continue to endure it." *Id.* at 28, 803 *A.*2d 611 (citation omitted). The Court concluded that Saylor did not meet that threshold requirement. *Id.* at 29, 803 *A.*2d 611.

Unlike the case before us, Saylor did not claim or present expert testimony that his employer's harassing conduct caused him a psychological illness that rendered him incapable of working and therefore entitled him to lost wages. More importantly, this Court did not hold that constructive discharge was a prerequisite to lost-wage damages in a retaliation case arising under LAD. *Shepherd* addressed entirely different issues, under entirely different facts, within the context of an entirely different statute. *Shepherd* cannot control the outcome of this case.

We need not decide here whether, under the anti-retaliation provisions of LAD, a plaintiff can proceed with a lost-wage claim when an employer's misconduct causes a mental-illness-induced retirement. For that reason, we decline to give an advisory

CEPA and LAD); *Abbamont v. Piscataway Twp. Bd. of Educ.,* 138 *N.J.* 405, 416–17, 650 *A.*2d 958 (1994) (applying LAD standard of *respondeat superior* to CEPA).

opinion on a case such as *Padilla v. Berkeley Educ. Servs. of N.J.*, 383 *N.J.Super.* 177, 181, 183–84, 891 *A.2d* 616 (App.Div.2005), in which a LAD plaintiff who failed to prove constructive discharge entitling her to lost wages never claimed that her employer-caused illness rendered her incapable of working. *See also Woods–Pirozzi v. Nabisco Foods,* 290 *N.J.Super.* 252, 276–77, 675 *A.2d* 684 (App.Div.1996) (LAD plaintiff who admitted she was medically able to work was not permitted lost wages when her constructive-discharge claim was dismissed at summary judgment). We simply hold here that, given the facts before us, lost wages are recoverable in a CEPA case, even in the absence of a constructive discharge.

## VII.

We conclude that the trial court properly charged the jury that Seddon could only receive "economic damages related to his psychiatric disability" if he proved that DuPont "proximately caused his disability, and that his disability rendered him unable to perform work for [the company]." With that charge, and based on the record before it, the jury had the authority to find that DuPont's retaliation rendered Seddon unfit for work and that Seddon was entitled to front and back pay for lost wages.

We therefore reverse the Appellate Division and reinstate the jury's award of economic damages to Seddon. Because the Appellate Division did not decide Seddon's challenge to the sufficiency of the attorneys' fees awarded to him by the trial court or DuPont's challenge to the punitive-damages award, we remand these and any other unaddressed issues for its consideration.

Justice LaVECCHIA, dissenting.

I harbor no disagreement with the majority that the Legislature created an important and necessary remedy for whistle-blowers through the enactment of the Conscientious Employee Protection Act (CEPA), *N.J.S.A.* 34:19–1 to –8. CEPA advances the salutary social policies of ensuring that employees can report harmful

practices without fear of losing their jobs, and that they can continue to act as public watchdogs for employer action that is contrary to law or public policy. *See N.J.S.A.* 34:19–3 (prohibiting retaliation against whistle-blowers and enumerating protected employee activity). To that end, CEPA is powerful medicine. Its remedies are designed to be prompt and to be particularly protective of those who wish to remain employed or to regain employment. *See N.J.S.A.* 34:19–5 (fixing one-year period for filing suit and defining available remedies). Specifically, CEPA identifies the remedies of an injunction to restrain continued violation of the Act; reinstatement to one's position or its equivalent; reinstatement of benefits and seniority rights; compensation for lost wages, benefits, and other remuneration; costs and attorney's fees; and a civil fine and/or punitive damages. *Ibid.* It also permits the award of "remedies available in common law tort actions" to prevailing plaintiffs,[1] *ibid.*, and therein lies my disagreement with the majority's view in this matter.

The result reached by the majority allows a plaintiff to claim adverse employment action—here specific claimed acts of retaliation—and obtain not only relief from those acts in the workplace but also, after leaving the workplace for retirement, to obtain front and back pay damages without satisfying the requirements for proving constructive discharge. My view of the proper application of CEPA's inclusion of "remedies available in common law tort actions" is profoundly different from that of the majority. By that language, CEPA was not transformed into a new configuration of those traditional tort remedies; yet that is exactly the result achieved today. The majority's analysis invests CEPA with a new application, one that, I believe, loses sight of the integrated form and meaning of this very important piece of social legislation. Because I cannot endorse the majority's analysis or judgment, however much I might agree about the high purpose and the

---

[1] Because of CEPA's election of remedies provision, *see N.J.S.A.* 34:19–8 (deeming filing of CEPA suit as election of remedies, effectively barring parallel litigation arising from common law theories), the breadth of the remedies, as a practical matter, must be at least coextensive with ordinary tort remedies.

social importance of CEPA, I respectfully dissent. Although not convincing for my colleagues in the majority, I feel compelled to record the essential reasoning behind my disagreement.

I.

This Court's grant of certification was limited to a single question: whether CEPA limits damages in the form of front and back pay to circumstances in which plaintiff proves actual or constructive discharge. *Donelson v. DuPont Chambers Works*, 203 *N.J.* 95, 999 *A.*2d 464 (2010).

In this case, plaintiff suffered the last act of retaliation, namely being sent for the "fit for duty" examination, in 2004. That became the lynchpin for his CEPA litigation, which was timely filed in 2005 while he remained employed. That plaintiff filed his CEPA action while still employed is not uncommon, and is in part why CEPA permits injunctive remedies. Such remedies ensure that, going forward, a non-retaliatory workplace is available to the whistle-blowing employee who remains on the job. In this matter, plaintiff asserted that in September 2006 he was assigned to work alone, something he regarded as further retaliation but which the employer justified as a means of removing plaintiff from interaction with the supervisor about whom he had complained. Plaintiff continued to remain employed, while discovery went on, until he took a disability retirement in December 2007. He then sought to obtain compensation for lost wages during the period from his retirement forward, as additional consequential damages from the earlier retaliatory acts that, in his complaint, he claimed against DuPont. He did not plead constructive discharge and specifically declined to do so when the question was pressed by the trial court.

In *Shepherd v. Hunterdon Developmental Center*, this Court considered the relationship between a continuing series of acts and a constructive discharge claim in the context of a Law Against Discrimination (LAD) [2] hostile work environment case. 174 *N.J.*

2 *N.J.S.A.* 10:5–1 to –49.

1, 803 *A*.2d 611 (2002). There, the Court first concluded, as to plaintiff Saylor, that the series of acts he asserted to be discriminatory were minimally sufficient to withstand a motion for summary judgment substantively and therefore saved his claim from dismissal based on the bar of limitations. *Id.* at 26, 803 *A*.2d 611. Turning to his claim that his decision to take an early retirement could qualify as constructive discharge, with the resulting, albeit unspoken, front and back pay claim, the Court concluded that it could not. *Id.* at 29, 803 *A*.2d 611. Although set in the LAD context, our decision had little to do with the LAD, specifically, but much to do with the interplay between a hostile work environment claim and one for constructive discharge in general.

The Court noted that the ordinary standard for constructive discharge recognizes that all employees have an obligation to do what is necessary to maintain employment, *id.* at 28, 803 *A*.2d 611 (citations omitted), with the result that only an employee who can demonstrate that conditions were "so intolerable" that he was compelled to leave and join the ranks of the unemployed can recover for wrongful discharge. *Ibid.* (citing *Jones v. Aluminum Shapes, Inc.*, 339 *N.J.Super.* 412, 428, 772 *A*.2d 34 (App.Div.2001)). Noting that the LAD permits recovery based on hostile acts that are "severe or pervasive," this Court commented that there are "subtle but discernible differences between the standard for a hostile work environment and the standard for a constructive discharge." *Ibid.* That is, the subset of LAD claims resting on constructive discharge has to meet both the LAD test that, in general, the employer knowingly permitted conditions of discrimination that were "severe or pervasive" and that they were also "so intolerable that a reasonable person subject to them would resign." *Id.* at 27–28, 803 *A*.2d 611 (quoting *Muench v. Twp. of Haddon*, 255 *N.J.Super.* 288, 302, 605 *A*.2d 242 (App.Div.1992)) (quotation marks omitted). The analysis was supported by Title VII jurisprudence to like effect. *Shepherd, supra,* 174 *N.J.* at 28–29, 803 *A*.2d 611 (citing *EEOC v. Univ. of Chicago Hosps.*, 276 *F*.3d 326, 331–32 (7th Cir.2002); *Woods v. Delta Beverage Grp., Inc.*, 274 *F*.3d 295, 301 (5th Cir.2001)); *see Pa. State Police v.*

*Suders,* 542 *U.S.* 129, 141, 124 *S.Ct.* 2342, 2351, 159 *L.Ed.*2d 204, 216 (2004) (noting that constructive discharge "inquiry is objective: Did working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign?").

In applying that test to Saylor, because the discrete act to which he pointed for constructive discharge was insufficiently egregious and because his course of conduct claims were only barely enough to get him past summary judgment on his LAD hostile work environment claim, we concluded that he could not meet the standard for constructive discharge. *Shepherd, supra,* 174 *N.J.* at 28–29, 803 *A.*2d 611. The policy rationale that underlies the *Shepherd* framework is clear, because any alternate reading of the interplay between the LAD and constructive discharge would turn every hostile work environment claim into one that would support a decision to leave one's employment.

## II.

Plaintiff sought to accomplish two things through this appeal. First, he argued for disapproval of *Shepherd* because the standard it set was asserted to be inconsistent with CEPA's goal of protecting and encouraging whistle-blowers. Second, in response to our post-argument inquiry whether the constructive discharge standard should be altered in CEPA actions involving a plaintiff who has been psychologically damaged, he asked that we adopt the following different standard in CEPA matters, namely that "[a]n employee is constructively discharged when he or she provides objective evidence of a medical or psychological condition caused by the employer's conduct or work environment which renders the employee [on the basis of a subjective standard] incapable of continuing to work in defendant's workplace." The majority's decision takes neither tack overtly; however, while employing an asserted "plain language" application of CEPA's other tort remedies, it has effectively altered, for CEPA plaintiffs, *Shepherd's* standard for securing the front and back pay relief that is rightful-

ly available to a former employee only for a constructive discharge.

Plaintiff's argument seeking disapproval of *Shepherd* rested on policies relating to encouraging CEPA plaintiffs and protecting them from retaliation by using broad readings of the available remedies. The flaw in that argument lies in the assertion that the Court in *Shepherd* in some fashion "raised the standard of proof for constructive discharge." In fact, the Court did not do so; we simply acknowledged that there is a preexisting body of tort law fixing the standard for that claim and, further, recognized that the LAD did not erase it. *See Shepherd, supra,* 174 *N.J.* at 27–29, 803 *A.*2d 611.

The same is true of CEPA: it did not erase or alter the standard for constructive discharge. The Act identifies available remedies, including those generally injunctive in nature, and permits ordinary tort remedies as well, but it does not expand or supplant them. The remedies are available to the greatest extent possible, but those sounding in tort have to be tethered to the underlying tort in its traditional formulation.

There is a relatively well-established body of law that limits constructive discharge claims, and in *Shepherd* this Court was careful to recognize that precedent and to explain why the standard is what it is. *Shepherd* was a carefully balanced opinion that evaluated the important policy interests at stake when assessing who should be entitled to front and back pay damages notwithstanding the individual's determination to leave a job. Those policy considerations include encouraging an employer to remedy, and remedy quickly, the complained of retaliation or discrimination from within, and encouraging the employee to do what is necessary and reasonable to stay employed. As we said in *Shepherd, supra:*

[A]n employee has the obligation to do what is necessary and reasonable in order to remain employed rather than simply quit. A trial court should consider the nature of the harassment, the closeness of the working relationship between the harasser and the victim, whether the employee resorted to internal grievance

procedures, the responsiveness of the employer to the employee's complaints, and all other relevant circumstances.

[174 *N.J.* at 28, 803 *A.*2d 611 (quoting *Shepherd v. Hunterdon Developmental Ctr.,* 336 *N.J.Super.* 395, 420, 765 *A.*2d 217 (App.Div.2001)).]

For those reasons, courts look not at how the plaintiff has been damaged, psychologically or otherwise, but rather, assess objectively the conduct to which the plaintiff was subjected and the conditions under which the plaintiff was working. As DuPont concisely, and I believe appropriately, argued in this matter: "[F]or those policy considerations to have any meaning, the plaintiff must be objectively reasonable in his reaction to the retaliation, [that is,] objectively reasonable in deciding he can no longer endure working, before the court will let him cast blame on the employer and collect damages flowing from the termination of employment that he initiated."

There is no rationale that would support a different analysis under CEPA than that which we recognized in *Shepherd.* Although the Act directs that the remedies be available "to the fullest extent possible," *N.J.S.A.* 34:19–5, it does not suggest that they be expanded beyond their traditional formulation. Stripped to its essence, the keystone to the majority's contrary conclusion, explained *ante* at 257–59, 20 *A.*3d at 392–93, is unsound.

Specifically, the majority's analysis conflates proximate causation and the extent of damages.[3] In so doing, it unhinges the fundamental tort-law notion that a plaintiff is entitled to only those

---

[3] For example, in discussing when an alleged tortfeasor has proximately caused an injured person to suffer a diminished earning capacity, the majority offers a baseball example typically used to illustrate the eggshell plaintiff rule, a maxim about the extent of damages and not about proximate causation. *Ante* at 258–59, 20 *A.*3d at 392–93. The example is typically utilized to show that a baseball player with a large salary might be entitled to tremendous damages if injured because of his idiosyncratic earning potential. However, proximate cause requires a different analysis, assessing not the degree of loss, but whether defendant's conduct caused the loss in earning capacity. The majority fails to recognize that the baseball player may not recover his future earnings if he could have continued to play at the same level but chose voluntarily to retire from the sport.

compensatory remedies that will make him whole in regard to the harms actually and proximately caused by defendant. *See Caldwell v. Haynes,* 136 *N.J.* 422, 433, 643 *A.2d* 564 (1994). After explaining that a person has a right to recover the entirety of his diminished earning capacity caused by another's tortious conduct, the majority concludes that "[t]o the extent [defendant] proximately caused Seddon to suffer a mental injury incapacitating him from his former employment, he has 'the right to recover damages for diminished earning capacity.'" *Ante* at 258–59, 20 *A.*3d at 392–93. The statement assumes the answer to the essential legal question: When has a defendant proximately caused a plaintiff to lose his employment and thereby suffer a diminished earning capacity?

We answered this question clearly in *Shepherd,* explaining that lost wages are caused by allegedly discriminatory or retaliatory conduct only when discharge, either actual or constructive, can be proven. In other words, where a plaintiff walks away from his employment, a defendant has caused (and is liable for) the coincident loss of wages only if the defendant's conduct was severe or pervasive enough to amount to constructive discharge.[4] CEPA

---

[4] Federal courts have consistently followed this rule of causation, holding that to receive an award for lost wages, a plaintiff who walks away from his employment must prove constructive discharge. *See, e.g., Lulaj v. Wackenhut Corp.,* 512 *F.*3d 760, 767 (6th Cir.2008) ("[T]he district court was correct to reduce, as a matter of law, the jury award for front pay to zero to conform to its finding of no constructive discharge."); *Spencer v. Wal–Mart Stores, Inc.,* 469 *F.*3d 311, 317 (3d Cir.2006) ("[A] successful hostile work environment claim alone, without a successful constructive discharge claim, is insufficient to support a back pay award. Put simply, if a hostile work environment does not rise to the level where one is forced to abandon the job, loss of pay is not an issue." (footnote omitted)), *cert. denied,* 551 *U.S.* 1141, 127 *S.Ct.* 2985, 168 *L.Ed.*2d 720 (2007); *Hertzberg v. SRAM Corp.,* 261 *F.*3d 651, 659 (7th Cir.2001) ("A victim of discrimination that leaves his or her employment as a result of the discrimination must show either an actual or constructive discharge in order to receive ... back and front pay[.]"), *cert. denied,* 534 *U.S.* 1130, 122 *S.Ct.* 1070, 151 *L.Ed.*2d 973 (2002); *Mallinson–Montague v. Pocrnick,* 224 *F.*3d 1224, 1237 (10th Cir. 2000) ("Because the jury rejected the Plaintiffs' claims that they were constructively discharged, the district court did not err in concluding that they were not entitled to back or front pay."); *Caviness v. Nucor–Yamato Steel Co.,* 105 *F.*3d 1216, 1219 (8th Cir.1997) ("[I]n the absence of constructive discharge, a plaintiff

does not purport to abrogate the basic and commonsense notion that when an employee voluntarily resigns or retires, the employee himself, and not the employer, has caused the cessation of paychecks.

Moreover, the majority's reasoning rests on a fundamental flaw revealed through its baseball player analogy. The baseball player is allowed to recover as against a *tortfeasor* lost income as part of economic damages because common law tort concepts allow it. *See Caldwell, supra,* 136 *N.J.* at 433, 643 *A.*2d 564 ("An injured party has the right to be compensated for diminished earning capacity. The measure of damages for tort recovery encompassing diminished earning capacity can be based on the wages lost as a result of the defendant's wrongdoing. That measure includes the value of the decrease in the plaintiff's future earning capacity." (citations omitted)); *see also Restatement (Second) of Torts: Damages* § 901 (1979) ("[W]hen there has been harm to earning capacity, the law can indemnify the plaintiff for pecuniary loss[.]"). However, until this Court's decision in *Pierce v. Ortho Pharmaceutical Corporation,* no like tort concept allowed an employee to recover similar lost wages from a former employer. 84 *N.J.* 58, 65–66, 417 *A.*2d 505 (1980).

In *Pierce,* this Court, recognizing that the common law has "the capacity ... to develop and adapt to current needs," first created a common law cause of action in tort for "wrongful discharge when the discharge is contrary to a clear mandate of public policy." *Id.* at 71–72, 417 *A.*2d 505; *see also Tartaglia v. UBS PaineWebber Inc.,* 197 *N.J.* 81, 102, 961 *A.*2d 1167 (2008) ("This Court first recognized a common law cause of action for retaliatory discharge when we decided *Pierce* in 1980."); *D'Annunzio v. Prudential Ins. Co. of Am.,* 192 *N.J.* 110, 119, 927 *A.*2d 113 (2007) ("[W]e held [in *Pierce* ] that an at-will employee, wrongfully discharged ... has a

is not 'made whole' by the equitable remedy of backpay."); *Jurgens v. EEOC,* 903 *F.*2d 386, 389 (5th Cir.1990) ("[I]n order for an employee to recover back pay for lost wages beyond the date of his retirement or resignation, the evidence must establish that the employer constructively discharged the employee.").

common law cause of action against an employer."). That alteration in the law reflected the reality that under the common law, employees were all at-will and had no right to lost wages following termination of employment. As we explained in *Tartaglia, supra,*

[s]een in its historical context, *Pierce* created an avenue for an at-will employee, who otherwise had little, if any, means of redress for termination, to assert that his or her discharge was wrongful.... We viewed [Pierce's] claim as being in the nature of constructive discharge and considered whether there were circumstances, apart from claims based on discrimination, in which termination of an at-will employee could be wrongful.

[197 *N.J.* at 104–05, 961 *A.*2d 1167.]

And, "we concluded that some non-discriminatory firings were nevertheless actionable." *Id.* at 105, 961 *A.*2d 1167.

Of course, CEPA codified the *Pierce* remedy [5] and, hence, this cause of action is brought under that statutory remedy. But the majority's misplaced reliance on tort law that permits a lost-earnings or diminished-earnings-capacity economic recovery as against a tortfeasor does not translate into support for relief in the circumstances of this present suit by plaintiff against his former employer, where constructive discharge was neither pled nor proved. In short, there is no common law avenue, outside of proving wrongful discharge or constructive discharge, for such economic damages to be awarded as against a former employer.

III.

As noted, plaintiff did not just fail to allege constructive discharge, he repeatedly disavowed it. As a result, the jury received no notice that plaintiff was claiming that he had been constructively discharged, like it received with respect to his co-plaintiff, Mr. Donelson, who pled constructive discharge and a CEPA violation (plus intentional infliction of emotional distress). Thus, the jury received no instruction on how to assess whether DuPont should

---

[5] The common law action still exists as an alternate track by which a plaintiff may pursue relief; however, a plaintiff relying on CEPA exercises an election of the statutory remedy in lieu of the common law wrongful discharge action. *See N.J.S.A.* 34:19–8.

be held responsible for plaintiff's departure as it did with respect to Mr. Donelson's constructive discharge claim. Nevertheless, over DuPont's objection, plaintiff was permitted to introduce evidence concerning the damages that flow from a constructive discharge, namely the wages he would have earned had he not retired.[6] There was no basis for the jury to award plaintiff the economic damages that might stem from the termination of his employment because no claim alleging a wrongful termination of employment, nor instructions for assessing such a claim, had ever been put to the jury. In such a setting, the verdict was not properly reached and the Appellate Division was correct in setting it aside. *See, e.g., Toto v. Princeton Twp.,* 404 *N.J.Super.* 604, 614–15, 962 *A.*2d 1150 (App.Div.2009) (rejecting unpled constructive discharge claim that was asserted through backdoor means of "giving it another name").

## IV.

In this matter, a constructive discharge claim was cloaked as a generalized CEPA retaliation claim. By camouflaging his constructive discharge allegation as a nondescript CEPA violation, plaintiff reaped the benefit of the more generous scope of relief available for constructive discharge claims without enduring the more onerous burden of proof associated with that cause of action. Where plaintiff made a conscious choice not to plead constructive discharge, CEPA should not allow backdoor access to front and back pay damages asserted to accrue post-retirement. In my view, the majority errs in concluding that CEPA's allowance for "other tort remedies" permits a CEPA plaintiff to receive a tort's remedy merely by filing a CEPA action claiming an adverse employment action without meeting the ordinary test for the

---

[6] Although plaintiff retired on disability pension, that does not suffice as proof that the employer *caused* a constructive discharge, at least not on this record where no such showing was made due to plaintiff's pleading strategy. We note that plaintiff did plead an intentional infliction of emotional distress claim, but the jury did not award any pain and suffering damages.

"other" tort whose remedy is invoked. CEPA's goals are not advanced by creating a far lighter standard of proof than the one imposed for constructive discharge.

JUSTICE RIVERA–SOTO, abstaining.

I abstain for the reasons previously expressed in *Hopewell Valley Citizens' Group, Inc. v. Berwind Property Group Development Co., L.P.*, 204 *N.J.* 569, 585–587, 10 *A.*3d 211 (2010) (Rivera–Soto, J., dissenting): although not "necessary," a condition precedent specifically required by the New Jersey Constitution, *N.J. Const.* art. VI, § 2, ¶ 1, a judge of the Superior Court was temporarily assigned to serve on the Supreme Court, and that judge cast a vote that affected the outcome of this appeal.

*For reversal/reinstatement/remandment*—Chief Justice RABNER and Justices LONG, ALBIN and Judge STERN (temporarily assigned)—4.

*For affirmance*—Justices LaVECCHIA and HOENS—2.

*For abstainment*—Justice RIVERA–SOTO—1.